CHEMAWA COUNTRY GOLF, INC. *vs.* LORRAINE WNUK.

Bristol.  December 13, 1979. — April 4, 1980.

Present: ARMSTRONG, ROSE, & KASS, JJ.

*Abuse of Process. Unlawful Interference. Damages,* Unlawful interference.

In an action by a golf club against the owner of nearby property for tortious interference with business relations, the judge erred in denying the defendant's motion for judgment notwithstanding the verdict where there was no evidence that the plaintiff had suffered damages as a consequence of the vexatious conduct of the defendant. [510-512]

TORT. Writ in the Superior Court dated April 20, 1972.

The case was tried before *Garrity,* J.

*Sharryn E. Ross* for the defendant.

*Henry G. Barrett* for the plaintiff.

KASS, J. Neighborliness and sweet reason have not characterized a decade of uneasy coexistence between the Wnuks, Lorraine Wnuk and Stephen Wnuk, and Chemawa Country Golf, Inc. (Chemawa). Their acrimony has spawned a battery of administrative and judicial proceedings (one came to this court),[1] including the action, now before us, by Chemawa for abuse of process and tortious interference with contractual relations. That suit was tried to a jury, which returned verdicts for the defendants Lorraine and Stephen on the complaints of abuse of process,[2] and a verdict of $15,000 for Chemawa and against Lorraine for tortious interference with business relations. After the verdict, Lorraine made timely motions for judgment notwithstanding the verdict and for a new trial. From the denial of these motions, Lorraine has appealed.

From the evidence, the jury might have found the following facts:

Since 1948, the Wnuks have owned a twenty-five-acre residential property on Cushman Road in North Attleborough. A golf course began operating on a property of about fifty-five acres across the road in 1959. Chemawa bought the golf course on November 17, 1969, and discord began the following June with a complaint by Lorraine about a noisy pool party at Chemawa which had lasted until 2:00 A.M. Several like complaints followed that summer. In 1970-1972 Chemawa expanded its facilities, especially around its swimming pool, and undertook to cut a new driveway entrance to its parking lot near the Wnuks' home. Resort to public authority now began in earnest. The Wnuks complained to the board of selectmen about zoning violations by Chemawa and that its late night activity constituted a nui-

---

[1] *Wnuk* v. *Chemawa Country Golf, Inc.*, 2 Mass. App. Ct. 872 (1974).

[2] The jury returned verdicts for Stephen on all components of Chemawa's complaint, and only Lorraine, therefore, has appealed from the judgments entered on the jury verdicts. Lorraine and Stephen had counterclaimed, alleging abuse of process against Chemawa. The jury returned verdicts for the defendant-in-counterclaim (Chemawa) on the Wnuk claims.

sance. They complained to the conservation commission of North Attleborough concerning a drainage culvert which Chemawa had installed. Between 1969 and 1973 they appeared fourteen times before the town planning board and addressed twenty written communications to it concerning a variety of Chemawa's enterprises and activities. Lorraine complained to the police about Chemawa cutting down a thirty-inch ash tree and an eighteen-inch maple tree (the tree warden ruled they were not to be cut down) and to the town health department about an allegedly unlawful chimney fireplace and allegedly unlawful placement of rubbish. She also called down the majesty of the law on a club member who was having a family cookout on the ground that he — or Chemawa — had not obtained a proper permit for outdoor burning.

The town revoked Chemawa's license to have live music and dancing on its premises and shortened the hours during which it might serve alcoholic beverages, so that none could be served after 11:00 P.M.

The jury might also have found that apart from involving public officials, agencies and courts, Lorraine parked her car next to the pool and blew her horn for twenty minutes at a time, that she played loud music, and that she clanged garbage can tops together for the purpose of annoying Chemawa's members.

During the course of the trial, the parties and the judge heaped all proceedings before courts and town boards into the category of "process." Our law is otherwise; in the context of an action for abuse of process, "'process' refers to the papers issued by a court to bring a party or property within its jurisdiction," e.g., a writ of attachment, the process used to initiate a civil action, and the process related to the bringing of criminal charges. *Jones* v. *Brockton Pub. Mkts., Inc.*, 369 Mass. 387, 390 (1975), and cases cited. Compare Restatement (Second) of Torts § 674 (1977), which describes a tort of wrongful use of civil proceedings. Since the jury were given to understand that all recourse to the machinery of government, judicial or otherwise, was "process," we

must assume that, in returning a verdict for the defendants, the jurors found that when the Wnuks protested to town agencies and initiated law suits, they did not do so with an ulterior purpose for which the particular proceeding was not intended. *Quaranto* v. *Silverman,* 345 Mass. 423, 426 (1963). Prosser, Torts § 121 (4th ed. 1971). So, for example, the jury's verdict implies a finding that the Wnuks' suits founded on alleged violations of zoning regulations and acts constituting a nuisance were intended to abate those violations and acts, not to drive Chemawa out of business or its principal officers out of their minds. We are left with the inference that, in finding for Chemawa on the claim of wrongful interference with contractual relations, which also imports the element of improper motive, the jury considered the other vexations which Lorraine visited upon Chemawa: the complaints, banging of trash pail covers and so forth.

In its classic form, the tort of interference with contractual relations involves the undoing of a business arrangement bound by contract. See e.g., *Lumley* v. *Gye,* 118 Eng. Rep. 749 (Q.B. 1853) (contract to perform services as a singer); Carpenter, Interference with Contractual Relations, 41 Harv.L.Rev. 728 (1928). Nolan, Tort Law § 71 (1979). The elements of the tort, as set out more than a century ago in *Walker* v. *Cronin,* 107 Mass. 555 (1871), are: "(1) intentional and wilful acts (2) calculated to cause damage to the plaintiffs in their lawful business, (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendant, (which constitutes malice), and (4) actual damage and loss resulting." At 562. In *Owen* v. *Williams,* 322 Mass. 356, 360 (1948), the court cited with approval the modern formulation of these principles in Restatement (Second) of Torts § 766 (1977). See *Ryan, Elliott & Co.* v. *Leggat, McCall & Werner, Inc.,* 8 Mass. App. Ct. 686, 688-689 (1979).

In the instant case the plaintiff charges no disruption of a particular contract, rather it complains of interference with prospective contractual relations. This is a recognized ex-

tension of the more typical tort. *Godin* v. *Niebuhr*, 236 Mass. 350, 351 (1920). Restatement (Second) of Torts § 766B (1979),[3] particularly Comment c, which includes in the field of potential harm "any other relations leading to potentially profitable contracts." It is not necessary that the prospective relation be expected to be reduced to a formal binding contract. *Id.* See *Botkin* v. *Miller*, 190 Mass. 411, 413 (1906) (call by a group of orthodox Jews for a boycott of a barbershop kept open on Saturday by a coreligionist); *Owen* v. *Williams*, 322 Mass. at 356-357 (interference with hiring of the plaintiff by a hospital as a special duty nurse).

As we have previously noted, it is an essential element of the tort that the defendant act without justifiable cause. *Grammenos* v. *Zolotas*, 356 Mass. 594, 597 (1970). *Pino* v. *Trans-Atlantic Marine, Inc.*, 358 Mass. 498, 504 (1970). *Ryan, Elliott & Co.* v. *Leggat, McCall & Werner, Inc.*, 8 Mass. App. Ct. at 689. The jury could have found that the purpose of Lorraine's repetitive activity was to obstruct the functioning of Chemawa's country club rather than to protect her own property rights.

It is also of the essence in an action for wrongful interference with contractual relationships that the plaintiff suffer damages as a consequence of the defendant's conduct, and those damages cannot be speculative or conjectural losses. *H. D. Watts Co.* v. *American Bond & Mortgage Co.*, 260 Mass. 599, 613-614 (1927). We find the record barren of any evidence on which the jury might have found that Chemawa was damaged by Wnuk's conduct. Chemawa's principal officer, Raymond Bourque, testified that Chemawa lost club members because of the blighting effect

---

[3] The text of § 766B is as follows: "One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation."

of construction work in progress which was delayed by the Wnuks' lawsuits.[4] Bourque also testified to time lost from work and legal expenses because of these proceedings. As we have seen, however, the jury, by returning verdicts for the defendants on the abuse of process complaint, must have concluded that Lorraine did not act with an improper purpose in connection with the law suits and proceedings before town agencies. With regard to the balance of Lorraine's activities concerning Chemawa, nothing is established other than that it was intensely irritating. Chemawa is a corporation which has no heart to ache or ulcer to bleed and, in any event, it is not vexation but interference with beneficial relations with third parties which must be established. The only tangible item of loss placed in evidence — $310 of expenses incident to a delay arising from an unwarranted complaint to the police made by Lorraine — concerned land which did not belong to Chemawa, but to Bourque. In *Botkin* v. *Miller,* 190 Mass. at 416, it was observed that "there is no evidence from any customer that he ceased to trade or to do business in this shop, because of fear that this disturbance of that night would be repeated. . . . On the evidence in the case it is at least as likely that the loss of business came from his customers of the Jewish faith leaving him for keeping open shop on a day when no business is done by Orthodox Jews." The same analysis defeats Chemawa's claim. The only club members who testified concerning Lorraine's activities remained as members. No evidence tied the loss of members or green fees to Lorraine's conduct (other than that which the jury found justified). On the other hand, there was evidence that an unrelated shooting

---

[4] The following from Bourque's testimony is illustrative: "Well, I was very embarrassed. It was always made a joke: how we are doing with the Wnuk case. When is it going to be settled. When are you going to fix the fairway. When can you finish construction. When is it ever going to end. People who would play golf would go away frustrated, mad. We lost golfers . . . And with all the problems that I was having, either in construction or curtailing the hour for my liquor license, they didn't want to come over to Chemawa to play golf."

incident had occurred at the club and, as in *Botkin* v. *Miller, supra,* it is at least as likely that Chemawa lost members for that quite different reason.

For this reason, the motion for judgment notwithstanding the verdict should have been allowed.[5] On the evidence, without weighing the credibility of the witnesses or substituting the court's judgment of facts for that of the jury, there is but one conclusion as to the verdict that can be reached. *O'Shaughnessy* v. *Besse,* 7 Mass. App. Ct. 727, 728 (1979), and cases cited.

*Judgment reversed*

*Judgment for the defendant.*

---

[5] The foundation for a motion for judgment notwithstanding the verdict was properly set by the defendant with a motion for a directed verdict at the close of the plaintiff's evidence.