UNITED TRUCK LEASING CORPORATION *vs.* RONALD GELTMAN
& another.[1]

No. 87-1360.

Middlesex.   December 13, 1988. — February 6, 1989.

Present: GREANEY, C.J., KAPLAN, & WARNER, JJ.

Further appellate review granted, 404 Mass. 1104 (1989).

*Unlawful Interference. Practice, Civil,* Directed verdict. *Consumer Protection Act,* Unfair act or practice, Businessman's claim.

The judge at the trial of a civil action incorrectly allowed the defendants' motions for directed verdicts where the plaintiff submitted evidence sufficient to warrant submission to the jury of its claims that the defendants wrongfully interfered with certain leasing contracts. [851-854]

The judge at the trial of a civil action correctly allowed the defendants' motions for directed verdicts on the plaintiff's claims for interference with prospective contractual relations, where the plaintiff failed to demonstrate any prospective business relationship sufficient to support the claimed interference. [855-856]

The judge who heard civil claims alleging the defendants' violations of G. L. c. 93A correctly concluded that the plaintiff did not establish any such violations and that the defendants' conduct, as a whole, was not unfair. [856-857]

CIVIL ACTION commenced in the Superior Court Department on May 8, 1980.

The case was tried before *J. Harold Flannery,* J.

*Harold Meizler (Saul L. Benowitz* with him) for the plaintiff.

*William H. Clancy* for the defendants.

GREANEY, C.J.   Claims were brought by the plaintiff in the Superior Court against the defendants for (a) intentional interference with a contract, (b) interference with prospective contractual relations, and (c) violations of G. L. c. 93A, §§ 2(*a*) and 11. The tort claims were presented to a jury at a trial

---

[1] Industrial Fleet Management, Inc.

presided over by a judge of the Superior Court. At the conclu-
sion of the plaintiff's evidence, the judge, upon the defendants'
motion, directed a verdict against the plaintiff. The judge alone,
see *Nei* v. *Burley*, 388 Mass. 307, 311-315 (1983), then pro-
ceeded to hear further evidence on the G. L. c. 93A claims,
which he considered along with the evidence that the plaintiff
had presented to the jury. The judge made findings of fact and
rulings of law, concluding that the defendants had not violated
G. L. c. 93A. The plaintiff's motion for a new trial on the
tort claims was considered and denied. The plaintiff appeals
from the denial of its motion for new trial on all the claims,
and from the separate judgments that were entered on the tort
and G. L. c. 93A claims. We conclude that it was error to
direct a verdict on the claims concerning intentional interfer-
ence with a contract. In light of this conclusion, the appeal
from the denial of the plaintiff's motion for a new trial on
these claims need not be separately considered. We agree with
the judge's resolution of the remaining claims.

We state the evidence before the jury which was most favor-
able to the plaintiff. The plaintiff is a large full-service truck
leasing company. When it solicits customers it assesses their
truck leasing needs. Based upon the plaintiff's anticipated in-
vestment in the custom-made trucks it proposes to lease to the
customer, the plaintiff proposes a rental rate schedule. If an
agreement to lease is reached, the parties usually sign a con-
tract.

The defendant, Ronald D. Geltman, vice president and re-
gional manager of the codefendant, Industrial Fleet Manage-
ment Inc. (Industrial), is a truck leasing consultant. Industrial
is a consulting firm specializing in truck and car leases. Geltman
and Industrial call on businesses that lease trucks, representing
that they can save their prospective customers money by check-
ing the customer's current bills for errors and negotiating
amendments to existing vehicle leasing contracts. The defend-
ants are paid fifty percent of the savings that they generate for
their customers. The defendants are the only operators of such
a consulting business in Massachusetts, and they are not direct
competitors of the plaintiff.

Geltman would visit the plaintiff's yard (and the premises of other leasing companies) to obtain the names of customers that the plaintiff and other lessors had under contract in order to call upon those customers and offer his consulting services. Geltman knew that his prospective clients had existing leasing contracts. In fact, he stated that "I wouldn't call [on] them if they didn't have a lease."

It was the defendants' policy to try to negotiate amendments to their customers' existing leasing contracts. This was accomplished by first telling the lessor that its contract rate was too high. If the lessor was not disposed gratuitously to lower its rates, the defendants would make contact with some of the lessor's competitors, obtain bids from them on the existing contract, and show the bids to the lessor. If the lessor was still unwilling to lower its rates, then the lessor was told that it would lose the lease when the contract came up for renewal. There were conversations concerning two of the plaintiff's accounts, Hampden Automotive Corporation and Ginsburg Paper, in which James Zeiner, a former consultant for Industrial, who was thereafter employed by another company called Flexi-Van, testified that the plaintiff was, in effect, told by the defendants, "[I]f you do not lower your rates today, we are going to open it to other companies and you are going to lose the account [on renewal]."

While Zeiner was at Flexi-Van, he received leads and bids on the plaintiff's contracts from Geltman. Specifically, Zeiner was shown the plaintiff's leasing contract with a drug company to review it and to bid against it. During his employment by the defendants, Zeiner did not invite the plaintiff to bid on any of his clients' leases, and he could not specifically recall any single account in which Industrial invited the plaintiff to bid, despite the fact that the plaintiff was one of the major truck leasing companies in Massachusetts.

Geltman also assisted the plaintiff's competitors in making bids. Geltman told the president of Truck Center Leasing, that if he (the president) "worked with him [Geltman], he would help . . . send some business [his] way." Thereafter, Geltman would call Truck Center Leasing personnel and tell them what

price to bid and then to bid on individual accounts. Specifically, concerning the plaintiff's Cara Donna account, Truck Center bid at Geltman's instruction, "[a]t least three or four times." Geltman told Truck Center that their bids could "knock the socks off any of the competitors, especially [the plaintiff]." As a consequence of Geltman's strategy, the plaintiff eventually lowered its existing contract rate to retain the account. Later, when Truck Center Leasing's president expressed dismay in not receiving the Cara Donna account, Geltman told him that there was another United account, Fulton Packing, in which "I'll let you — bring you in, that's a lot of trucks involved there, we'll make sure you get that one, or we'll work hard to get you that one."

A specific example of the defendants' involvement with one of the plaintiff's existing contracts was the Universal Fixtures (Universal) contract. While Zeiner was employed at Flexi-Van he made contact with Geltman, because he "wanted to keep the [Universal] account" which was changing over to the plaintiff. At Zeiner's request, Geltman called on Universal offering his consulting advice. Universal retained Geltman as a consultant. After hiring Geltman, Universal showed him its signed leasing contract with the plaintiff. From the plaintiff's contract, Geltman could determine the plaintiff's pricing structure. That structure was reported to Zeiner. Thereafter, Universal decided to break its contract with the plaintiff and to enter into a new leasing contract with Flexi-Van. When Universal's corporate officers expressed concern about the two leasing contracts, Geltman suggested that an escape clause be inserted in the Flexi-Van contract. The clause provided that if the plaintiff pursued litigation against Universal as a result of its Flexi-Van contract, then Universal, upon giving notice, could terminate its lease with Flexi-Van. Estimated lost profits to the plaintiff from the abandoned Universal contract were $20,000 per year, over its three-year term.

Geltman also worked with Matthew's Salad House. The plaintiff had been calling on Matthew's Salad House for about six years. After becoming a client of Geltman, Matthew's Salad House decided to begin leasing some refrigerated trucks

for its operation. Although the plaintiff specialized in refrigerated trucks, and has "certain services that no other company has . . . [such as their] own refrigeration-maintenance people and mobile trucks that do on-site maintenance," and despite their "very close . . . physical proximity" to Matthew's Salad House, the plaintiff was not invited by Geltman to bid on the account. When the plaintiff's personnel inquired as to why it was not invited to bid, Geltman stated that "there's no obligation to call every leasing company in . . . . [E]very other leasing company had given [the defendants] leads, [the plaintiff] had not . . . [so] why should [Geltman] give leads to a company that's trying to take food out of his family's mouth." Leads, Geltman explained, occurred when he was called by a lessor who wanted to secure a particular account but was getting nowhere on its own (such as Flexi-Van and the Universal account situation). The plaintiff claimed an estimated $175,000 loss on the Matthew's Salad House account. There was evidence, however, that, despite Geltman's actions, the plaintiff presented a leasing proposal to Matthew's Salad House, and that the plaintiff's bid was higher than the bid of the company receiving the contract. The plaintiff also knew the amount of its competitor's bid when it made its proposal to Matthew's Salad House.

1. *Common law claims.* We first examine the plaintiff's common law claims to ascertain, under the governing standard, whether the allowance of the defendants' motion for a directed verdict was proper. That standard is whether " 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' " *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972), quoting from *Kelly* v. *Railway Exp. Agency, Inc.*, 315 Mass. 301, 302 (1943). *Service Publications, Inc.* v. *Goverman*, 396 Mass. 567, 571 (1986). We may affirm the judge's ruling on any ground that supports it, even if that ground was not specifically relied upon by the judge. *Id.* at 572.

(a) Intentional interference with a contract. The plaintiff's claims of intentional interference with a contract concern its

leasing contract with Universal. A plaintiff is entitled to recover against a defendant for procuring a breach of contract if he establishes that (1) he had an existing contract with a third party, (2) the defendant knew that fact, (3) the defendant induced the other person to break the contract and (4) damage was incurred. See *Walker* v. *Cronin*, 107 Mass. 555, 562 (1871); *Owen* v. *Williams*, 322 Mass. 356, 360 (1948); *Grammenos* v. *Zolotas*, 356 Mass. 594, 597 (1970); *Steranko* v. *Inforex, Inc.*, 5 Mass. App. Ct. 253, 272-273 (1977); *Chemawa Country Golf, Inc.* v. *Wnuk*, 9 Mass. App. Ct. 506, 509 (1980).

In Massachusetts, a plaintiff has made out a prima facie case on the tort when he submits evidence that would warrant findings that the defendant intentionally interfered with the plaintiff's existing contract with a third party to the plaintiff's damage. Justification and privilege are considered affirmative defenses. The plaintiff does not have to meet these defenses in his affirmative case. Rather, it falls to the defendant to plead and prove that his conduct was either justified or privileged.[2] See *Ross* v. *Wright*, 286 Mass. 269, 271-272 (1934); *Owen* v. *Williams*, 322 Mass. at 360; *Keegan* v. *O'Donnell*, 310 Mass. 346, 349-350 (1941); *Steranko* v. *Inforex, Inc*, 5 Mass. App. Ct. at 272-273. Cf. *Goldhor* v. *Hampshire College*, 25 Mass. App. Ct. 716, 720 (1988) (breach of contract claim).

---

[2] In concluding that a prima facie case has been made out when a plaintiff shows that the defendant procured a breach of the plaintiff's contract with a third party that caused the plaintiff damage, Massachusetts follows the definition of the tort appearing in the Restatement of Torts § 766 (1940). See *Owen* v. *Williams*, 322 Mass. at 360. The Restatement (Second) of Torts § 766 (1977) has moved away from this formulation. That authority defines an actionable interference as one that is both "intentional" and "improper." *Id.* Whether the interference is "improper" is left to the balancing of seven factors, including the interferer's motive, the nature of his conduct and interests, and the nature of the interests with which he has interfered. Other States hold that a plaintiff has not made out a prima facie case unless he shows that the interference is wrongful by some measure beyond the fact of the interference itself. In these States justification or privilege does not become an issue unless "the acts charged would be tortious on the part of an unprivileged defendant." *Top Serv. Body Shop, Inc.* v. *Allstate Ins, Co.*, 283 Or. 201, 210 (1978). See discussion in *Leigh Furniture and Carpet Co.* v. *Isom*, 657 P.2d 293, 302-304 (Utah 1982). See also *Blake* v. *Levy*, 191 Conn. 257, 262 (1983), and cases cited.

Contrast *ELM Medical Lab., Inc.* v. *RKO Gen., Inc.*, 403 Mass. 779, 787 (1989) (plaintiff failed to show that defendant's alleged interference with business relations was intentional).

Within the framework of the tort as outlined above, we agree with the plaintiff that its evidence was sufficient to warrant submission to the jury of its claims concerning the defendants' interference with its leasing contract with Universal. Based upon the evidence, and the reasonable inferences that could have been drawn therefrom, the jury could have concluded that Zeiner, a former business colleague of Geltman, had engaged Geltman to regain the Universal contract for Zeiner's company, Flexi-Van; that Geltman, after learning of the plaintiff's contract with Universal, gave advice to Universal which was designed to promote Zeiner's goal (and thereby earn himself commissions); that Geltman tipped Zeiner off about the plaintiff's rates so Zeiner's company could make a favorable bid to regain the lost contract; that Geltman suggested the escape clause to Universal's officers to persuade them to break the contract with the plaintiff when they harbored doubts about taking such a course; and that the plaintiff incurred a loss as a result of Geltman's interference.[3]

To be sure (as the defendant points out) there was also evidence in the plaintiff's case[4] which would have warranted a finding by the jury that Geltman's actions may have been justified because he furnished truthful information or honest advice to Universal.[5] However, it was not the judge's function

---

[3] No question was raised at the trial that a finding that Geltman had engaged in wrongful conduct would also subject the defendant Industrial Fleet Management, Inc., to liability.

[4] This evidence came principally from Zeiner and Geltman, who were called as adverse witnesses by the plaintiff in its case.

[5] Restatement (Second) of Torts § 772 (1977) provides as follows:

> "One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person
>    (a) truthful information, or
>    (b) honest advice within the scope of a request for the advice."

As to truthful information, comment b to § 772 points out that the

to conclude that such a finding was required by the jury on an issue on which the defendant had the burden of proof. See *Pahigian* v. *Manufacturers' Life Ins. Co.*, 349 Mass. 78, 86 (1965). Further, inferences should not have been drawn in favor of the defendants in assessing the evidentiary value of the plaintiff's case. See *Graci* v. *Massachusetts Gas & Elec. Light Supply Co.*, 7 Mass. App. Ct. 221, 225 (1979). A plaintiff faced with a motion for a directed verdict is entitled "to the benefit of all the evidence most favorable to him", *Campbell* v. *Thornton*, 368 Mass. 528, 535 (1975), quoting from *Kelly* v. *Railway Exp. Agency, Inc.*, 315 Mass. 301, 302 (1943), and the jury must pass on the merits of the plaintiff's case if any inference can be drawn in his favor " 'even if there may be other and different circumstances disclosed in the evidence which, if accepted as true by the jury, would support a conclusion adverse to the plaintiff.' " *Stewart* v. *Roy Bros. Inc.*, 358 Mass. 446, 448 (1970), quoting from *Howes* v. *Kelman*, 326 Mass. 696, 697 (1951). See *H.P. Hood & Sons, Inc.* v. *Ford Motor Co.*, 370 Mass. 69, 71-72 (1976). The plaintiff in this case was entitled to have the jury consider its evidence under these standards, guided by correct instructions of law on the issues of credibility, the respective burdens of proof, including the defendants' burden of establishing justification, and the various elements of the tort. The jury then could have decided whether (as the plaintiff maintains) the defendants wrongfully interfered with the plaintiff's contract with Universal, or whether (as the defendants maintain) the involvement between Geltman and Universal was justified.

---

interference remains proper "even though the facts are marshaled [by the defendant] in such a way that they speak for themselves and the person to whom the information is given immediately recognizes them as a reason for breaking his contract or refusing to deal with another."

As to honest advice, comment c to § 772 states that the protection applies even if "the actor also profits by the advice or . . . . dislikes the third person and takes pleasure in the harm caused to him by the advice."

We accept § 772 of the Restatement (Second) as Massachusetts law, and consider truthful information and honest advice matters of justification for a defendant to establish. See *Walker* v. *Cronin*, 107 Mass. at 566 ("interference [with a contract] by way of friendly advice, honestly given" is not wrongful).

(b) *Intentional interference with prospective contractual relations.* The plaintiff's claims in this area principally concerned the Matthew's Salad House account. The tort of intentional interference with prospective contractual relations constitutes an extension of the tort of intentional interference with a contract. To reach the jury on these claims, the plaintiff was required to furnish evidence that it had a prospective relationship with Matthew's that the law would protect, that Geltman interfered with that relationship, and that his conduct caused the plaintiff some ascertainable loss. See *Chemawa Country Golf, Inc.* v. *Wnuk,* 9 Mass. App. Ct. at 510 n.3.

We agree with the judge that the plaintiff's proof failed to make out a case on these claims. First, as a consultant, Geltman was not required, on pain of tort liability, to obtain a bid for the Matthew's account from the plaintiff. "Deliberately and at his pleasure, one may ordinarily refuse to deal with another, and the conduct is not regarded as improper, subjecting the actor to liability." Restatement (Second) of Torts, § 766, comment b. Second, although "[i]t is not necessary that the prospective relationship be expected to be reduced to a formal binding contract", *Chemawa Country Golf, Inc.* v. *Wnuk,* 9 Mass. App. Ct. at 510, there was no evidence that the plaintiff had been negotiating with Matthew's or even that it had been habitually dealing with it. There was also no evidence that the plaintiff and Matthew's had any other relationship, short of an actual contract, with which the plaintiff interfered. The mere fact that the plaintiff had called upon Matthew's six times in the hope of leasing trucks to it does not suffice to establish a prospective business relationship sufficient to support the claimed interference. Third, "[i]t is also of the essence [of the tort] . . . that the plaintiff suffer damages as a consequence of the defendant's conduct, and those damages cannot be speculative or conjectural losses." *Chemawa Country Golf, Inc.* v. *Wnuk, ibid.* The plaintiff's evidence indicated that it eventually did submit a bid to Matthew's (after learning the amount of its competitor's bid), and that its bid was higher than the one accepted. This make the plaintiff's evidence of damages tenuous at best. The evidence on this aspect of the

case portrayed a disappointed bidder for which the tort alleged affords no remedy.[6]

2. *The G. L. c. 93A claims.* The judge sat as a separate fact finder on the plaintiff's c. 93A case. After considering the evidence before the jury on the common law claims and hearing from several additional witnesses, the judge entered a separate memorandum of decision containing findings of fact and conclusions of law. The judge concluded that no violations of G. L. c. 93A had been established.

The plaintiff maintained to the judge that Geltman had excluded it unfairly from bidding opportunities, sought to manipulate bids to increase Industrial's income at the plaintiff's expense, and had threatened the plaintiff in order to coerce it into complying with bid rigging schemes. In his memorandum, the judge stated that he found that these "allegations [were] unsupported by credible evidence." He also found that the plaintiff "has been invited to bid to [the defendants'] clients and that it has existing leases with a dozen or so [of the defendants'] clients."

The plaintiff's particularized allegations of unfair conduct presented a question of fact for the judge. See *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 616 (1983). The judge resolved the allegations on the basis of credibility determinations after a full trial on the merits. His further finding that the plaintiff had access to the defendants' clients has support in the record. Because the judge's findings are not clearly erroneous, see *First Penn. Mortgage Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 621-624 (1985), we will not disturb them.

---

[6] The evidence in the plaintiff's case referred to three other accounts which it claimed had been adversely affected by the defendants' activities. Two accounts, Hampden Automotive Corporation and Ginsburg Paper, involved the possible loss of the accounts on renewal if rate adjustments were not made. There was no evidence that a rate adjustment occurred or that the accounts were not renewed. The third account, the Cara Donna account, did receive a rate adjustment. There was no evidence of what that adjustment was. The plaintiff's claims concerning these three accounts fail for the reason (if no other) that no proof of loss or damages has been shown. See *Chemawa Country Golf, Inc.* v. *Wnuk*, 9 Mass. App. Ct. at 510-511.

Additionally, the judge evaluated Geltman's conduct as a whole to ascertain whether it fell within the broad (and somewhat elusive) concept of unfairness set forth in *PMP Associates, Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975). The judge concluded that the conduct was not unfair, summing up his view as follows:

> "Geltman did what lawyers, accountants and financial advisors do every day, and he did it for the benefit of his clients. His means did not entail the misuse of proprietary or otherwise confidential information or any other 'shady' practice, and harm to [the plaintiff] was not his objective. Rather, he analyzed lessors' bids with a practiced eye and advised his clients about them, and on occasion he represented clients in negotiations with bidders. That 'middleman' role presents opportunities for misconduct, but the function itself is not illicit and the evidence here does not show that Geltman performed it improperly."

The judge's analysis, based, as it is, on his acceptance of the evidence produced by the defendants, the competitive nature of the parties' business, and the consideration that the parties are not commercial innocents, conforms to the facts found and warranted a conclusion that no unfairness had been established. As a fact finder separate from the jury, the judge concluded, in substance, that Geltman had acted in a manner that was consistent with the latitude given a consultant to furnish a client with truthful information or honest advice so that the client can make a discriminating business judgment. We do not consider it necessary to discuss the plaintiff's reliance on certain decisions of the Federal Trade Commission in an effort to change this conclusion, beyond stating that the decisions find the presence of anti-competitive and illegal conduct based on facts that differ materially from those found by the judge. The case falls outside of G. L. c. 93A, § 11. Cf. *Doliner* v. *Brown*, 21 Mass. App. Ct. 692, 698 (1986).

3. *Conclusion.* The judgment on the directed verdict is reversed as to counts I and II of the complaint insofar as those counts state claims concerning the plaintiff's contract with Universal Fixtures. That judgment is affirmed in all other respects.

The judgment on the G. L. c. 93A claims (counts VI and VII of the amended complaint) is affirmed.

*So ordered.*