Adcom Products, Inc. *vs.* Konica Business Machines
USA, Inc., & others.[1,2]

No. 94-P-1303.

Norfolk. December 5, 1995. - August 14, 1996.

Present: Warner, C.J., Dreben, Kass, Smith & Flannery, JJ.

*Practice, Civil,* Judgment notwithstanding verdict. *Unlawful Interference.*
*Contract,* Interference with contractual relations. *Consumer Protection
Act,* Businessman's claim.

Evidence at the trial of a claim for tortious interference with prospective
contractual relations warranted the jury's conclusion that the defendant
had intentionally and improperly interfered with a contemplated
contract of the plaintiff. [104-107] Kass, J., dissenting, with whom
Flannery, J., joined.

Civil action commenced in the Superior Court Depart-
ment on November 7, 1991.

The case was tried before *Thomas E. Connolly,* J.

*Janet Steckel Lundberg* for Konica Business Machines
USA, Inc.

*John Arthur Johnson* was present but did not argue.

Warner, C.J. The plaintiff, Adcom Products, Inc. (Ad-
com), brought this action in the Superior Court against the
defendant, Konica Business Machines, U.S.A., Inc. (Konica),
for tortious interference with prospective contractual relations
(Count I) and for a violation of G. L. c. 93A (Count II).
Count I was tried before a jury. At the close of Adcom's case
and at the close of the evidence, Konica moved for a directed

[1]Richard F. Clarke and Howard M. Yalen, against whom the action was
dismissed by the plaintiff.

[2]The case was originally heard by a panel comprised of Chief Justice
Warner and Justices Kass and Flannery and was thereafter submitted on
the record and briefs to Justices Dreben and Smith, all of whom took part
in the decision on the case pursuant to Mass. R.A.P. 24(a), 365 Mass. 872
(1974). See *Sciaba Constr. Corp.* v. *Boston,* 35 Mass. App. Ct. 181, 181 n.2
(1993).

verdict. These motions were both denied. The jury returned a special verdict in favor of Adcom on Count I in the amount of $410,000. The judge then denied Konica's motion for judgment notwithstanding the verdict or in the alternative for a new trial and entered judgment for Adcom on Count I. After a hearing on the G. L. c. 93A claim, the judge ordered judgment in favor of Konica on Count II. Konica's motion for reconsideration of the denial of the motions was denied. Konica appeals. (Adcom has not appealed from the judgment on Count II.) We affirm.

The standard for reviewing a judgment notwithstanding the verdict is "whether, anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972), quoting *Kelly* v. *Railway Express Agency, Inc.*, 315 Mass. 301, 302 (1943)." *Freeman* v. *Planning Bd. of W. Boylston*, 419 Mass. 548, 550 (1995). *O'Shaughnessy* v. *Besse*, 7 Mass. App. Ct. 727, 728-729 (1979). Likewise, in reviewing the denial of Konica's motion for judgment notwithstanding the verdict, "we will construe the evidence most favorably to the plaintiff and *disregard that favorable to the defendant*" (emphasis supplied). *Barbosa* v. *Hopper Feeds, Inc.*, 404 Mass. 610, 613 (1989), quoting from *Cimino* v. *Milford Keg, Inc.*, 385 Mass. 323, 326 (1982).

Taking the evidence, and all reasonable inferences in favor of Adcom, the jury could have found the following facts. On November 1, 1989, Adcom became an authorized dealer for Konica for marketing Konica copiers. Around the summer or fall of 1990, Adcom became aware of a copier replacement program to be undertaken by Polaroid Corporation. Adcom's sales manager, James Dinell, sent Polaroid's representative, Jane Cameron, brochures on the Konica machines, and scheduled a trial demonstration of the equipment. This demonstration went extremely well, and Polaroid's representatives appeared to like the Konica product.

Polaroid then sent a request for quotation to Adcom, which, when answered, led Polaroid to select Adcom as one of its five finalists to make a presentation. The winner would get the contract. Adcom was the sole Konica representative to make the final group. The other two eliminated Konica bidders were Konica (the defendant in this case) and Conway Office Products (Conway).

Howard Yalen, branch manager of Konica, was informed at this time that his division of Konica was the highest of the three Konica bidders. While Cameron did not tell him who the other two bidders were, Yalen admitted assuming they were Adcom and Conway. Yalen also admitted concluding, upon hearing from Polaroid, that he (Konica) had no chance of obtaining the contract.

Yalen was no stranger to Adcom. In fact, Yalen's prior relationship with Adcom was marked by negative associations, including confrontations with them. Joanna Salkovitz, a family friend of Yalen's, testified unqualifiedly that Yalen made numerous comments to her over time denigrating J. Robert McCann, Adcom's president, and Adcom at various social gatherings.[3] Salkovitz also remembered that, at one social dinner, Yalen threatened to "make sure" that Adcom would be disqualified as a Konica dealer.

Adcom sought assistance in its presentation from the dealer support manager of Konica, Ken Matthews. Upon sharing news of the potential Polaroid deal with Matthews, Adcom successfully stalled an otherwise imminent termination of its Konica dealership contract for ninety days, a termination prompted by Adcom's earlier failure to meet its sales quotas. The January 22, 1991, presentation, according to the three Adcom participants, McCann, Dinell, and Matthews, was very successful. Matthews sent a letter to Polaroid expressing confidence in Adcom, McCann opined that Adcom was going to be awarded the contract, and Dinell stated he had the best rapport with Polaroid's Cameron that he had ever had with a buyer in a large corporation.

Approximately three months after the presentation, Cameron called Dinell and requested the immediate receipt of additional rental pricing information, to be used "right away for a meeting." Several weeks later, on May 6, 1991, Cameron called at 8:45 A.M. to request further cost information. Around 1:30 P.M. on the same day, Cameron called Adcom with an urgent message regarding Adcom's status as an authorized dealer, explaining that she had received a call from Yalen, who claimed that Adcom was no longer a dealer. Al-

---

[3]Yalen not only made comments about Adcom, generally, but also he spoke derogatorily of McCann's personality, specifically. For example, Salkovitz testified to Yalen saying he "didn't like Bob or the company or the way it did business."

though Dinell responded accurately that indeed Adcom was an authorized dealer, both Dinell and Cameron agreed that the matter needed further investigation.[4]

Yalen claimed that he acted to protect Konica; in previous situations, unauthorized dealers had used the Konica name and, when copier problems had arisen, his branch of Konica was held responsible.

Four days after this confrontation, Cameron asked Yalen's office to resubmit their bid, and she requested additional presentations from other vendors. Polaroid ultimately did not choose either Adcom or Yalen's Konica branch as their vendor; Konica's numbers were too high, and Yalen's telephone call to Polaroid regarding Adcom's status undermined the viability of Adcom's service and ultimately destroyed its deal.[5]

In order to prevail in this case, Adcom was required to prove (1) a business relationship or contemplated contract for economic benefit with a third party; (2) Konica's knowledge of such a relationship; (3) Konica's interference with it through improper motive or means; and (4) Adcom's loss of advantage directly resulting from Konica's conduct. *United Truck Leasing Corp.* v. *Geltman*, 26 Mass. App. Ct. 847, 855 (1989), *S.C.*, 406 Mass. 811, 816 (1990). See also *Chemawa Country Golf, Inc.* v. *Wnuk*, 9 Mass. App. Ct. 506, 509-510 (1980). The jury, which had the option of believing all, some, or none of the testimony of the various witnesses, were warranted in concluding that Konica had intentionally and improperly interfered with a contemplated contract. See *Cramer* v. *Commonwealth*, 419 Mass. 106, 111, 113 (1994). See also *Kane* v. *Learned*, 117 Mass. 190, 194 (1875); Liacos, Massachusetts Evidence § 2.10, at 58-60 (6th ed. 1994).

There was ample evidence of (1) a contemplated contract for economic benefit with a third party and (2) Konica's knowledge of such contract. *United Truck Leasing Corp.* v.

---

[4]Further investigation revealed that, while Konica had agreed to postpone the sending of its termination letter to Adcom for ninety days, Konica's internal records reflected the originally scheduled termination date — March, 1991. Yalen had received his information from a Konica employee who had checked the internal records. The actual termination date, however, had been extended to June 4, 1991.

[5]Yalen admitted to knowing that his telephone call could certainly destroy any chance that Adcom had of winning the contract.

*Geltman*, 26 Mass. App. Ct. at 855. Moreover, Konica has not relied on those elements. We address Konica's contention that Adcom failed to prove elements (3) and (4).

Regarding the third element, there was sufficient evidence of improper motive.[6] Generally, the propriety of the actor's motives in a particular setting necessarily depends on the attending circumstances, and must be evaluated on a case-by-case basis. *G.S. Enterprises, Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 273 (1991). Here, the attending circumstances amount to enough evidence to warrant a finding that Yalen's real motive was to hurt Adcom. Contrast *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. at 817.

In this case, the jury were warranted in finding an improper motive where the evidence, portrayed in the light most favorable to Adcom, revealed the following. First, Yalen harbored and expressed antipathy toward Adcom prior to the Polaroid scenario, which waxed upon hearing that Adcom was a potential winner of the contract; thus, Yalen was motivated by enmity. Second, Yalen knew he was eliminated from the original group of five finalists, and had himself concluded that his branch was definitely out of the deal; thus, he was not acting within a legitimate business or competitive scenario. Third, if Yalen was acting in part, as he explained, to protect the reputation of Konica, he could have simply notified his boss, Richard F. Clarke, instead of calling Polaroid directly. This was obviously not lost on the jury. Fourth, Yalen called Polaroid, knowing the information he conveyed would have an adverse effect on Adcom's ability to win the contract, and little to no effect on his own ability to win the contract.[7]

From this evidence, the jury could have concluded that Yalen's decision to call Polaroid was based on retaliation or ill will toward Adcom, rather than the good of the Konica company or of his own branch.

---

[6]The jury need only believe evidence of improper means *or* motive, not both. See *G.S. Enterprises, Inc.* v. *Falmouth Marine, Inc.*, 410 Mass. 262, 272 (1991). Thus, a further inquiry into the evidence of improper means is unnecessary.

[7]In addition, there was ample evidence that even a hint of suspicion about whether a dealer was authorized or not would be more than sufficient to cause a corporation such as Polaroid not to enter into a contract with such a dealer. Here, Yalen's call raised more than just a hint.

Likewise, regarding the fourth element, there was adequate credible evidence that Adcom's loss of advantage directly resulted from Konica's conduct, in other words, that Adcom's loss of the contract directly resulted from Yalen's telephone call. The jury, the fact finder and final arbiter of the tort claim, could believe that Polaroid chose Adcom as one of its five finalists for the copier contract; that Polaroid was pursuing Adcom as a supplier when Cameron called Dinell requesting information regarding rental pricing three months after the presentation; and that Polaroid was still pursuing Adcom when on May 3, 1991, Cameron needed information for a meeting "right away."

Furthermore, the jury would be warranted in finding that Cameron's May 6, 1991, call to Dinell at 8:45 A.M. requesting information on additional costs on the rental pricing indicated Cameron was still pursuing Adcom, and that Yalen called Cameron on that same day and told her Adcom was no longer an authorized dealer.[8] In addition, the jury could find that Yalen's call spurred Cameron to call Adcom and inquire about its status; that four days later Cameron called Yalen and requested that his Konica branch resubmit a bid; and that, subsequently, Polaroid did not award the contract to Adcom.

Accepting all the evidence as true and all of the reasonable inferences that may be drawn from it, the standard of review that we must apply, we agree with the trial judge's statement in connection with his rulings of law on Adcom's claim under G. L. c. 93A that the jury were warranted in concluding that Polaroid would have awarded the contract to Adcom and that Yalen's actions were the proximate cause of Adcom's loss. Given the evidence summarized above, we conclude that the jury's determination as to causation does not go against the clear weight of the evidence. *Solimene* v. *B. Grauel & Co., KG,* 399 Mass. 790, 802 (1987). *Kaltsas* v. *Duralite Co.,* 4 Mass. App. Ct. 634, 639-640 (1976).

The judge properly denied the motions for judgment

---

[8]The jury could have rejected Cameron's testimony that Adcom had been eliminated as a contender for the contract back on January, 1991. Indeed, her actions after January, 1991, could be viewed as inconsistent with her testimony.

notwithstanding the verdict or in the alternative for a new trial on the claim we have considered in this appeal.[9]

*Judgment affirmed.*

KASS, J., (dissenting, with whom Flannery, J. joins). 1. *Existence of prospective contract and causation.* On Adcom's theory of the case, it was the malevolent telephone call from Yalen on May 6, 1991, that put the kibosh on Adcom's prospects with Polaroid. What, however, was the evidence that Adcom enjoyed genuine prospects — rather than buoyant hope — of a sales and service contract with Polaroid? It was testimony that Adcom's sales team, in their presentation of January 11, 1991, were extremely pleased with how effectively they had rhapsodized Konica's equipment and Adcom's service organization to Polaroid. If the rosy glow of optimism on the cheek of a salesman who has just concluded a pitch rises to the level of prospective contractual relations, then the level for actionable prospects has sunk perilously low. See *United Truck Leasing Corp.* v. *Geltman,* 26 Mass. App. Ct. 847, 855 (1989) ("the plaintiff was required to furnish evidence that it had a prospective relationship . . . that the law would protect"), *S.C.,* 406 Mass. 811 (1990). After all the discovery, Adcom offered no evidence — such as meeting notes, internal memoranda, or conversations of Polaroid — that tended to prove that Polaroid had provisionally selected or greatly favored Adcom as a vendor of copying machines and service.

Matched against these great expectations was the testimony of Jane Cameron, the head buyer of Polaroid, a witness allied with neither party. She testified, with some documentary support, that Adcom had been struck from the list of potential vendors immediately after the January presentation because of a too small service department and lack of experience in the copier field; the Yalen call of May 6, 1991, had played no role in the elimination of Adcom. There was not a scintilla of evidence that Cameron had any motive to shade her testimony against Adcom and in favor of Konica. She had rejected the offerings of both.

---

[9]We have considered Konica's other arguments and find they have no merit.

This impressed the trial judge who, in ruling on Adcom's c. 93A count, found:

> "Adcom was out of the running for the Polaroid copier contract before Yalen telephoned Cameron on May 6, 1991. Cameron did not seriously consider awarding the copier contract to Adcom after Adcom's presentation on January 22, 1991, and Yalen's telephone call on May 6 had no effect on Cameron's decision not to award the contract to Adcom. . . . Because of Polaroid's size and geographic locations, Cameron considered awarding the contract only to a company which had a proven service record in the copier industry and more than ten service technicians available to service copiers in the field. . . . At the time of Adcom's presentation to Polaroid on January 22, 1991, its service department consisted of four service technicians who serviced copiers in the field, of whom only two had been trained to service Konica copiers."

We think the trial judge's ruling on the tortious interference claim, notwithstanding his view of the case, that "[t]here was sufficient evidence on which the jury could find that Konica was liable to plaintiff for tortious interference with a[ ] . . . contemplated contract of economic benefit," reflected a too mechanical application of the law that pertains to judgment n.o.v. Indeed, the trial judge's comments on the record when the motions for directed verdict and, later, judgment n.o.v. were presented reflect his perception that the appellate courts of the Commonwealth have come to regard judgment n.o.v. as a virtual dead letter and that he would invariably be reversed if he followed his convictions in the case.

The majority base their opinion on the jury's entitlement to disbelieve Cameron's testimony. It is not obvious that the general rule concerning the fact finder's choice to disbelieve testimony applies or ought to apply in relation to a neutral witness and, in any event, such disbelief would not prove the contrary of the testimony. See *Commonwealth* v. *Michaud,* 389 Mass. 491, 498 (1983); *Kaitz* v. *Foreign Motors, Inc.,* 25 Mass. App. Ct. 198, 200 (1987). Even so, the majority say, Cameron's request to Adcom on May 6, 1991, for additional price information constitutes sufficient evidence that on that date, the same date Yalen made his telephone call, Adcom

still enjoyed prospects with Polaroid. Cameron, however, had testified that she made her May 6 inquiry because it was her policy not to inform even discarded bidders that they had been counted out until a contract award had been made and to continue to accumulate information from all available sources until Polaroid had made its decision. To that evidence the majority again respond that the jury were not bound to believe Cameron. Prescinding from the question whether that is correct, it is certainly not correct that the jury were free to make up some other explanation. In the final analysis, there is no evidence on which a fact finder might do more than conjecture that Adcom had tangible prospects for a contract with Polaroid and that anything done by Yalen for Konica damaged those prospects.

In order to avoid a judgment n.o.v., evidence must be "sufficiently concrete to remove any inference which the jury might draw from it from the realm of mere speculation and conjecture." *Alholm* v. *Wareham*, 371 Mass. 621, 627 (1976). See also *O'Shaughnessy* v. *Besse*, 7 Mass. App. Ct. 727, 729 (1979). In our view, the majority opinion confirms the apprehension of the trial judge that any evidence favorable to a plaintiff, even if it requires liberal doses of conjecture to make it yield inferences favorable to the plaintiff, requires the trial judge to eschew use of the common law tool of judgment notwithstanding the verdict. Such an approach transforms a venerable principle of accommodation between judges and juries into an iron rule of abnegation, substituting unexamined deference for careful appraisal. To illustrate the point, if the majority's approach is correct, both the *Alholm* case and the *O'Shaughnessy* case were wrongly decided.

2. *Improper purpose or means.* An improper purpose may lodge in officious intermeddling, see *Leigh Furniture & Carpet Co.* v. *Isom*, 657 P.2d 293, 307 (Utah 1982), inducing the repudiation of matured contracts, see *Melo-Tone Vending, Inc.* v. *Sherry, Inc.*, 39 Mass. App. Ct. 315, 319 (1995), or animus toward the target unrelated to legitimate business interest. *Boothby* v. *Texon, Inc.*, 414 Mass. 468, 487 (1993). *Sereni* v. *Star Sportswear Mfg. Corp.*, 24 Mass. App. Ct. 428, 433 (1987). No doubt Yalen harbored an animus against Adcom, but the source of that dislike stemmed solely from commercial relations with Adcom. There was no evidence of animus toward Adcom based on a personal reason or any

other unrelated to the legitimate business interests of Konica. Assuming the jury's disbelief of Yalen's explanation, that he acted out of concern for harm to Konica's reputation should Polaroid buy Konica copiers from someone who would not be around to service them, the jury could not on that basis, in the absence of other evidence, find that Yalen harbored some nonbusiness spite against Adcom that he was acting out.

As to whether the means were improper, Yalen's report to Polaroid that Adcom was not a Konica dealer was accurate not only insofar as he reasonably thought — he had been so informed — but also in point of fact if one takes into account that Adcom's dealership status was over as of June 4, 1991, before a contract with Polaroid would have begun. Indeed, one may easily hypothesize Konica being charged by Polaroid with deceptive conduct had it failed to disclose that Adcom had lost its dealer status. Yalen's statement was not freighted with any of the characteristics of statements thought to be improper means, namely, those that are false, misleading, laden with innuendo, extortionate, or otherwise threatening. See *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. at 817; *W. Oliver Tripp Co.* v. *American Hoechst Corp.*, 34 Mass. App. Ct. 744, 752 (1933); Restatement (Second) of Torts § 767 comment c (1979). It is important that proof of claims of wrongful interference with prospective contractual relations be subject to rigorous standards lest persons in commerce be intimidated into silence and passivity. In the course of a commercial skirmish, there will be casualties. It does neither healthy commerce nor the judicial system any good to soothe the wounds through lawsuits. The motion for judgment notwithstanding the verdict or, in the alternative, the motion for a new trial should have been allowed. We respectfully dissent.