Gants, J.
The plaintiffs, Tech Plus, Inc. (“Tech Plus”) and Betsy Piper, have brought an eight-count complaint against the defendants, Michael Ansel and his father, Sumner Ansel, claiming intentional interference with Tech Plus’s business relationship with a client, defamation, breach of Michael Ansel’s duty of loyalty, intentional infliction of emotional distress, concert of action, and violations of G.L.c. 93A. The Ansels brought a nine-count counterclaim, alleging abuse of process, breach of contract and of the implied covenant of good faith and fair dealing, negligence, discrimination on the basis of Michael Ansel’s gender and religion, and violations of Chapter 93A. The Ansels have moved for summary judgment on the plaintiffs’ complaint; the plaintiffs have moved for summary judgment on the Ansels’ counterclaim. After hearing and for the following reasons stated below, the defendants’ motion for summary judgment on the complaint is ALLOWED IN PART and DENIED IN PART, and the plaintiffs’ motion for summary judgment on the counterclaim is ALLOWED.
Since each motion for summary judgment presents distinct issues, I will treat them separately.
I. DEFENDANTS’ MOTION FOR SUMMARY JUDGMENT ON THE COMPLAINT
A. Background
In evaluating a motion for summary judgment, I must rely on facts not in dispute as well as disputed facts viewed in the light most favorable to the nonmoving party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995). Consequently, the facts stated below are presented in the light most favorable to the plaintiffs and should not be misunderstood as findings of the court.
Tech Plus is an independent sales representative for various hardware and software manufacturers. Betsy Piper is its President.
On August 5, 1995, Tech Plus and Lumina Office Products, Inc. (“Lumina”) entered into a Manufacturer Sales Representative Agreement in which Tech Plus was appointed Lumina’s sales representative in the New England region. At this time, Lumina was bringing to market the Lumina Series 2000, a multi-function office machine that printed, faxed, and scanned documents.
In September 1995, Tech Plus hired Michael Ansel (“Michael”).[1] Shortly after he was hired, Michael told Piper that Wayne Eckstein, the Division Vice President for Printers and Facsimiles at Staples, Inc. (“Staples”), was a close friend of him and his father and, through Eckstein, he could help Lumina get its products into Staples. Given Staples’ size and sales market, Staples was an important sales target for Lumina.
In November 1995, Michael Ansel contacted Staples and arranged a meeting with representatives from Staples, Lumina, and Tech Plus. Before the meeting with Staples on November 27, 1995, Robert Haggerly, Lumina’s Chief Executive Officer, Steven Cason, Lumina’s Vice President for Sales, Barbara Nelson, Lumina’s Vice President for Marketing, and Piper and Michael Ansel from Tech Plus met for lunch. At lunch, Michael said that he had been a floor salesperson for Staples and that his father was a former Staples employee who now acted as a sales representative to Staples. After lunch, the representatives of Lumina expressed concern to Piper about Michael’s role in any transaction with Staples, believing that his product and industry knowledge was weak. Piper reassured them that she planned to use him only as the account sales assistant and that she brought him to the meeting only because of his role in arranging it.
The meeting later that afternoon with Eckstein from Staples went well. Eckstein orally agreed that Staples would test market the Lumina Series 2000 beginning January 1, 1996 in the New York area, which comprised roughly 78 stores. At the meeting, Piper asked if Eckstein had any problem dealing with sales representatives such as Tech Plus, noting that she had heard that at least one buyer at Staples refused to deal with any sales representatives. Eckstein said he had no problem with Tech Plus being involved in the transaction, but that he wanted “the kid” (referring to Michael Ansel) “to do the store detailing.”
On December 13, 1995, Michael telephoned Steven Cason from Lumina. He told Cason that he was very close with Eckstein, and that Eckstein was not happy *672 that Michael was not the sales representative on the Lumina deal and was not making any commissions on it. He made it clear that Piper would be ineffective on that account and that Eckstein would never allow her, and not him, to get commissions from any dealings with Staples. He told Cason that “she can’t get arrested on that account,” meaning that there was absolutely nothing that Piper would be able to do with that account.
Michael then told Cason that he was miserable at Tech Plus because Piper did not treat him well. He told Cason that Piper puts him down because he is Jewish. Cason recalled that Michael said that Piper was antiSemitic and was constantly persecuting him because he was Jewish. Cason said that he did not recall Michael using “any improper terminology” in describing Piper’s anti-Semitism and did not remember the specific words that Michael used. Michael also said that Piper harbored prejudice against gays. He described a conversation with Piper in which she told Michael that she thought Cason was gay and that this might have an impact on the Staples deal.
Michael said he was going to leave Tech Plus and wanted to be Lumina’s sales representative. He again spoke of his close relationship with Eckstein, and asked repeatedly, “What do you want to do?” Cason said that all he wanted was a test run with Staples as had been agreed in the November 27 meeting. Michael told Cason several times during this conversation that “you could lose your job over this.”
Later that day, Cason received a telephone call from Sumner Ansel. Sumner told Cason that Piper could not do anything on the Staples account, that the Ansels could do everything for him on that account, and that Sumner would make sure of that. He said that the Eckstein and Ansel families were very close, and that Eckstein was like a godfather to Michael. In short, he made it clear that, because of his and his son’s close personal relationship with Eckstein, Lumina would get nothing from Staples unless it retained Michael as its sales representative. He also told Cason that Piper lived with 200 cats and was a lunatic who should be committed, and that she was sick, crazy, and mentally ill.
Around this time period (Cason cannot recall whether it was before or after the telephone calls with the Ansels), Eckstein telephoned Cason and told him that he did not want Piper to handle the Lumina account. Eckstein told Cason, “I don’t want that woman in here.” Cason said that was no problem.
On December 14, Michael informed Piper that he was terminating his employment with Tech Plus. One day later, Cason telephoned Piper and told her of his conversations with the Ansels. She vigorously denied the allegations they had made. Cason told Piper not to contact Staples on Lumina’s behalf and that he (Cason) would handle the Staples account himself.
Cason next heard from Michael Ansel on January 16, 1996, when Michael inquired about the status of the Staples deal. Michael said several times that he wanted to act as the sales representative for Lumina. Cason put him off by noting that he had not yet even received the Staples purchase order. Michael suggested that he telephone Staples to obtain the purchase order, and Cason told him that he did not want him to do that.
On February 5, 1996, Cason met with Michael Noblett, a Staples buyer who worked for Eckstein. Since Eckstein had earlier told Cason that he did not want Piper to act as his sales representative, Cason suggested other possible sales representatives who could represent Lumina with Staples. None of the names he gave included Michael or Sumner Ansel. Noblett said there was no need for a sales representative since Lumina was providing Staples with only one product, and it was better for Staples to work directly with Lumina. Cason responded that Lumina was a new company with a small sales staff and, if a problem arose, it may be helpful to have an independent sales representative available to deal with it. Noblett said it was Lumina’s decision as to whether to retain a sales representative, and that he would discuss with Eckstein the representatives suggested by Cason. On February 6, via a telephone message, and on February 7, in a telephone conversation, Eckstein told Cason that he did not want an independent sales representative involved in the Lumina/Staples deal.
Since Staples did not want an independent sales representative involved in the Lumina/Staples transaction and specifically did not want Piper involved, Lumina gave Tech Plus on March 1, 1996 a thiriy day notice removing Staples from the territory that Tech Plus covered on behalf of Lumina.
In late January 1996, Staples did place a purchase order for the test sale of the Lumina Series 2000, and Lumina shipped its product to Staples on February 4, 1996. The Series 2000 units were sold in New York area Staples stores for a period of 90 days beginning April 4, 1996 in accordance with Staples’ agreement with Lumina. Under that agreement, if more than 78 Series 2000 units were sold per week during the test period, Lumina would be entitled to sell its Series 2000 product in all Staples’ stores. Lumina failed to meet this sales target, and Staples discontinued sales of the Series 2000 after the 90 day test period. Lumina paid Tech Plus its commission on all sales made during this period through Staples.
B. Discussion
To prevail on summary judgment, the moving party must establish that there is no genuine issue of material fact on every element of a claim and that it is entitled to judgment on that claim as a matter of law. See generally Mass.R.Civ.P. 56(c); Highlands Insurance Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997). Where, as here, the party opposing summary judg *673 ment has the burden of proof at trial, the moving party is entitled to summary judgment if it “demonstrates, by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party’s claim.” Id. It is sufficient to demonstrate that “proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991).
1.Counts I, II, and III: Intentional interference with business and contractual relations
In order to prove that the Ansels intentionally interfered with an advantageous business or contractual relationship, as alleged in Counts I, II, and III, the plaintiffs must prove the following elements:
1. that Tech Plus had a contract with a third party, or “a business relationship or contemplated contract for economic benefit with a third party”;
2. that the defendants knew of this contract or this business relationship;
3. that the defendants intentionally interfered with this contract or business relationship through improper motive or means; and
4. that the defendants suffered loss as a direct result of the defendants’ conduct.
Adcom Products, Inc. v. Konica Business Machines USA, Inc., 41 Mass.App.Ct. 101, 104 (1995), rev. denied, 423 Mass. 1111 (1996). See also United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 815-16 (1990). The defendants concede that there is evidence sufficient to satisfy the first two elements, but they contend that there is no credible evidence to satisfy the third and fourth elements.
a. The Third Element
It is plain that the third element may be met by a showing either of improper motive or improper means. United Truck Leasing Corp. v. Geltman, 406 Mass, at 816; King v. Driscoll, 418 Mass. 576, 587 (1994). The improper motive required is actual malice — "a spiteful, malignant purpose, unrelated to the legitimate corporate interest." King v. Driscoll, 418 Mass, at 587, quoting Wright v. Shnners Hospital for Crippled Children, 412 Mass. 469, 476 (1992), which quotes Sereni v. Star Sportswear Mfg. Corp., 24 Mass.App.Ct. 428, 433. See also Shea v. Emmanuel College, 425 Mass. 761, 764 (1997). “The motivation of personal gain, including financial gain, . . . generally is not enough to satisfy the improper interference requirement. ” King v. Driscoll, 418 Mass, at 587. Nor is “personal dislike” enough to prove an improper motive. Id. There is evidence in the record sufficient to show that both Michael and Sumner Ansel were motivated by actual malice when they spoke with Cason. If one credits Cason’s recollection of those conversations, the Ansels were maliciously trying to discredit Piper and Tech Plus by describing Piper as anti-Semitic, homophobic, and unstable. While the law permits someone to criticize a competitor in order to win a contract, the Ansels went well beyond that, into the realm of spite and character assassination, in the language they used to undermine Piper and Tech Plus.
Moreover, there is also evidence that the means the Ansels used in trying to win the Lumina account for Michael were improper. In United Truck Leasing Corp., in examining whether the plaintiff had proven the use of improper means, the Court looked to whether there was a violation of a statute or rule of common law, and whether the defendant used threats, misrepresented facts, or defamed anyone. 406 Mass, at 817. See also Adcom Products, Inc. v. Konica Business Machines USA, Inc., 41 Mass.App.Ct. at 110 (improper means include making statements that are “false, misleading, laden with innuendo, extortionate, or otherwise threatening”). Here, there is evidence that, while Michael Ansel was still a Tech Plus employee and bore a duty of loyalty to his employer under the common law, the Ansels initiated discussions with Cason and Eckstein in which they painted Piper as an anti-Semitic, homophobic, mentally unstable woman and did all they could to undermine Tech Plus’ relationships with both Staples and Lumina.
I recognize that “(i]t is important that proof of claims of wrongful interference with prospective contractual relations be subject to rigorous standards lest persons in commerce be intimidated into silence and passivity.” Id. at 110. However, if the plaintiffs’ evidence is believed, the defendants’ alleged conduct does not fit into any reasonable definition of healthy commerce or competition.
As discussed at length later in this decision, I also recognize that, when not stated to undermine a business relationship, the First Amendment protects the expression of opinions that someone is anti-Semitic, homophobic, and mentally unstable, and bars such statements from forming the basis for a claim of defamation or intentional infliction of emotional harm. The tortious interference claims here, however, do not rest solely on the use of those derogatory characterizations. Rather, these claims are focused on the defendants’ overall conduct of trying to undercut Tech Plus’s relationships with Staples and Lumina so that Lumina would fire Tech Plus as its sales representative to Staples and replace it with Michael Ansel; the derogatory characterizations were simply part of the conduct designed to accomplish that improper purpose. In short, the expression of opinion, however derogatory, is constitutionally protected speech, but it is not protected when it forms part of the conduct involved in the intentional interference with a contractual or business relationship through improper motive *674 or means. See Dulgarian v. Stone, 420 Mass. 843, 851-52 (1995).
b. The Fourth Element
The defendants contend that the plaintiff cannot establish loss as a direct result of the defendants’ alleged conduct. It may indeed by difficult to establish pecuniary loss as a. result of the defendants’ conduct. Even if their telephone calls caused Lumina to remove Tech Plus from the Staples account, Lumina paid Tech Plus its commission for the sales made to Staples of the Series 2000 during the test period. Since those sales failed to meet the target agreed upon with Staples, there were no sales to Staples of this product beyond the test period. Consequently, even if Tech Plus had continued as Lumina’s sales representative with Staples, it would not have earned more commissions that it did. Nor is there evidence that Cason believed the Ansels when they told him that Piper was anti-Semitic, homophobic, and a lunatic. As a result, these telephone calls did not ultimately affect Lumina’s long-term relationship with Tech Plus.
However, damages in claims of intentional interference are not limited to pecuniary damages; damages are allowed in such cases for emotional distress and actual harm to reputation to the extent they are foreseeable. Draghetti v. Chmielewski, 416 Mass. 808, 819 (1994). Consequently, even if the plaintiffs’ proof were to fail with respect to pecuniary loss, there is evidence of emotional distress and actual harm to reputation sufficient for these claims to go forward. Therefore, the defendants’ motion for summary judgment as to Counts I, II, and III is denied.
2. Count IV; Breach of Duty of Loyalty
“Employees occupying a position of trust and confidence owe a duty of loyalty to their employer and must protect the interests of the employer.” Chelsea Industries, Inc. v. Gaffney, 389 Mass. 1, 11 (1983). “Because he is bound to act solely for his employer’s benefit in all matters within the scope of his employment, an executive employee is ‘barred from actively competing with his employer during the tenure of his employment, even in the absence of an express covenant so providing.’ ” Id. at 11-12 quoting Maryland Metals, Inc. v. Metzner, 282 Md. 31, 38 (1978) (emphasis in original). An at-will employee, like Michael Ansel, may properly plan to go into competition with Tech Plus and may even take steps to do so while still employed by Tech Plus, but he cannot actually commence competing with his employer while he is still employed. See Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 172-73 (1991). Nor, while still an employee, may he enter into a course of conduct designed to hurt his employer by stealing a client or by attempting to damage the reputation of his employer. Id. at 173.
Since Michael had no covenant with Tech Plus not to compete, he was free to compete with Tech Plus after he left its employ on December 14, 1995, but not before. The plaintiffs have more than sufficient evidence to show that Michael, while still a Tech Plus employee, breached his duty of loyalty by attempting to compete with Tech Plus and undermine its relationship with Lumina and Staples. Consequently, the defendants’ motion for summary judgment as to Count IV is denied.
3. CountV: Defamation
The plaintiffs contend that Michael Ansel defamed them when he told Cason that Piper was (1) anti-Semitic, (2) that she persecuted him because he was Jewish, and (3) that she was prejudiced against gays, and that Sumner Ansel defamed them when he told Cason that (4) Piper was mentally unstable. To determine whether these four statements may form the basis for a defamation claim, this court must conduct a three-step analysis.
First, it must determine whether the words were expressions of opinion (which are protected under the First Amendment) or statements of fact (which are not). See, e.g., Lyons v. Globe Newspaper Co., 415 Mass. 258, 263 (1993); Cole v. Westinghouse Broadcasting Co., Inc., 386 Mass. 303, 308-09, cert. denied, 459 U.S. 1037 (1982). ‘The determination whether a statement is one of fact or opinion is generally considered a question of law.” Cole, supra at 309.
“In deciding whether statements can be understood reasonably as fact or opinion ‘the test to be applied... requires that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.’ ” Id. at 309, quoting Information Control Corp. v. Genesis One Computer Corp., 611 F.2d 781, 784 (9th Cir. 1980). See also Lyons, supra at 263.
Second, if the words were expressions of opinion, the court must determine if the opinion implies the allegation of undisclosed defamatory facts as the basis for the opinion. See, e.g., Lyons, supra at 415. In National Association of Gov’t Employees, Inc. v. Central Broadcasting Corp., the Supreme Judicial Court adopted the principles in §566 of the Restatement (Second) of Torts setting forth when the expression of an opinion nonetheless can be actionable in defamation. 379 Mass. 220, 227 (1979), cert. denied, 446 U.S. 935 (1980). The Court declared:
The matter is put thus in Comment C, second par.; “A simple expression of opinion based on disclosed or assumed nondefamatoiy facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is. But an expression of opinion that is not based on disclosed or assumed facts and *675 therefore implies that there are undisclosed facts on which the opinion is based, is treated differently.” Thus if I write, without more, that a person is an alcoholic, I may well have committed a libel prima facie; but it is otherwise if I write that I saw the person take a martini at lunch and accordingly state that he is an alcoholic. See Illustrations 3 and 4 to §566.
Id. at 227-28 (footnotes omitted). The rationale is that, when an opinion is accompanied by factual statements, it is understood by the listener that the opinion is based on those factual statements; if false, those factual statements may be actionable in defamation but the opinion cannot be, no matter how unjustified and derogatory it may be. Cole, supra at 313; Restatement (Second) of Torts, §566, comment c. However, where the opinion is not accompanied by factual statements, the listener in certain circumstances reasonably may understand that the opinion implies the existence of specific undisclosed facts that are defamatory. In those circumstances, the declaration of the opinion is effectively the declaration of the underlying but undisclosed factual statements, which are actionable if proven false. Cole, supra at 313. The focus in defamation cases of this type is on the implied undisclosed factual statement; it must be both identifiable and false. Id.
Third, the court must determine whether there is evidence that the asserted factual statement or the identifiable, implied, undisclosed factual statement is false. No defamation action, even one involving a private person, can prevail if the statement at issue is truthful. See generally Gertz v. Robert Welch, Inc., 418 U.S. 323, 347-48 (1974).
This tripartite analysis differs with respect to each of the four alleged defamatory statements. I will examine the first two together, since they are related, and the latter two separately.
a. The allegedly defamatory statements by Michael Ansel that Piper was anti-Semitic and persecuted Michael because he was Jewish.
Surprisingly, I have found no Massachusetts cases (and none were cited by counsel) that decide whether an accusation of bigotry, whether it be anti-Semitism or racism, is a statement of fact or an expression of opinion. Many courts in other jurisdictions, however, have addressed the question and concluded that an accusation of bigotry is an expression of opinion. See, e.g., Ward v. Zelikovsky, 643 A.2d 972, 980 (N.J. 1994) (accusation that plaintiffs “hated Jews” not actionable); Stevens v. Tillman, 855 F.2d 394, 402 (7th Cir. 1988) (holding that accusation of racism is not actionable under Illinois law unless it implies the existence of undisclosed defamatory facts); Cibenko v. Worth Publishers, Inc., 510 F.Supp. 761, 766 (D.N.J. 1981) (holding that accusation of racism is nonactionable opinion under federal constitutional law). See also Buckley v. Littel 539 F.2d 882 (2d Cir. 1976) (holding that use of the term “fascist” to describe William F. Buckley, Jr. constituted opinion); Rutherford v. Dougherty, 91 F.2d 707 (3d Cir. 1937) (holding that clergyman’s accusation that radio broadcaster stirred up religious hatred and bigotry was not libelous). As the New Jersey Supreme Court summarized after reviewing the relevant case law throughout the country:
These cases demonstrate that most states do not consider words of bigotry or racism to constitute actionable defamation, thus protecting the freedom to express even unpopular, ugly and hateful, political, religious, and social opinions.
Ward v. Zelikovsky, 643 A.2d at 982.
I concur with this line of cases and find that an accusation of anti-Semitism is an expression of opinion. A person calling someone anti-Semitic may mean many things but the term is generally best understood as a characterization of another person’s state of mind towards Jews. As such, it can perhaps be shown to be unjustified or unwarranted as a characterization, but it cannot be proven to be false and “[a]n assertion that cannot be proved false cannot be held libelous.” Cole v. Westinghouse Broadcasting Co., Inc., 386 Mass, at 312 quoting Hotchner v. Castillo-Puche, 551 F.2d 910, 913 (2d Cir.), cert. denied sub nom. Hotchner v. Doubleday & Co., 434 U.S. 834 (1977). See also Ward v. Zelikovsky, 643 A.2d at 979 (‘The significance of opinion/fact and non-fact/fact distinctions centers on the concept of verifiability. Requiring that a statement be verifiable ensures that defendants are not punished for exercising their First Amendment right to express their thoughts.”).
Michael Ansel disclosed to Cason at least one reason why he believed Piper to be anti-Semitic: she allegedly was persecuting him because he was Jewish.[2] This statement essentially alleges that Piper discriminated against Michael in the conditions of his employment based on his religion. While it, too, is a characterization of her conduct towards him, it is a characterization that the law recognizes to be capable of being proven true or false, since we ask juries to reach a verdict on issues such as this in eveiy discrimination case. See, generally, G.L.c. 151B, §4(1) (unlawful practice for an employer to discriminate against an employee in the terms, conditions, or privileges of employment because of his religious creed). Yet, I am persuaded, for three reasons, that an allegation of discrimination, like an allegation of bigotry, should also be found to be an expression of opinion.
First, an allegation of discrimination, like an allegation of bigotry, focuses on a person’s state of mind. Since no one can see inside another’s mind, we must infer someone’s state of mind from what she says and what she does, both of which, at least theoretically, may be objectively ascertained. One either said something or she did not; one either did something or she did not. No such objective ascertainment is available *676 when the question is whether one thought something or did not. Since truth is an absolute defense to a claim of defamation and since the First Amendment jealously protects one’s thoughts, a false statement of what one said or what one did is properly actionable as defamation but an alleged false statement as to what one thought is not. See Ward v. Zelikovsky, 643 A.2d at 979.
Second, if the law is truly to protect freedom of expression, it must draw lines that are clear enough to permit protected statements to be made without the threat of a defamation action. The law of defamation should not be so blurred that, along its periphery, only the bold, the careless, and the well-heeled will dare to speak. Quite frankly, if the law declared that it is not defamatory to call someone an anti-Semite but is defamatory to say that she discriminated against someone because he was Jewish, this distinction may be comprehensible to a lawyer but I doubt that it would make sense to anyone else. It would certainly not lend itself to practical guidance as to what is protected speech and what is not. The law draws a far clearer line, one much easier to apply, if it declares that one can freely characterize someone’s state of mind but a statement about what one has done or said had better be truthful.
Third, I have great concern that permitting a defamation claim based on an allegation of discrimination would be as chilling to a person’s freedom of expression, indeed more chilling, as permitting a defamation claim based on an allegation of bigotry. Cf., generally, Ward v. Zelikovsky, 643 A.2d at 980. If this were the law, one could not voice a concern that someone’s conduct towards him was affected by his race, religion, ethnicity, religion, or sexual orientation without having to worry that the allegation will trigger a defamation claim. “Individuals should be able to express their views about the prejudices of others without the chilling effect of a possible lawsuit in defamation resulting from their words.” Rybas v. Wapner, 457 A.2d 108, 110 (1983). In short, the First Amendment protects the free expression of someone’s belief that another is prejudiced or that her conduct is affected by that prejudice, whether that belief is fair or unfair, but it does not protect someone’s false statement as to what someone did or said. See, e.g., Herlihy v. Metropolitan Museum of Art, 608 N.Y.S.2d 770 (Sup. 1994) (defamation action may not proceed on issue of whether plaintiff was anti-Semitic but may proceed on issue of whether or not plaintiff made specific statements, such as “You Jews are such liars”).
Since I have found that Michael Ansel’s statements to Cason that Piper was anti-Semitic and that she was persecuting him because he was Jewish are both expressions of opinion that are not themselves actionable, I must now determine whether there were undisclosed facts that are so specifically implied by the opinion as to make those undisclosed, but implied, facts separately actionable. Here, as the Supreme Judicial Court found in Cole, “(I]t is not clear that any undisclosed facts are implied, or if any are implied, it is unclear what they are.” 386 Mass, at 313. Unless undisclosed facts are specifically implied by an opinion, so it is clear what those facts are, those undisclosed implied facts cannot be actionable as defamation; the defendant cannot be held liable for defamation when it is not clear what defamatory facts he has implied. See id.
b. The allegedly defamatory statement by Michael Ansel that Piper was prejudiced against gays.
Michael Ansel’s statement to Cason that Piper was prejudiced against gays must also be found to be an expression of opinion, since it focuses on Piper’s state of mind. Nor are there undisclosed facts that are so specifically implied by the opinion as to make those undisclosed, but implied, facts separately actionable. Indeed, here, while talking about Piper’s alleged prejudice against gays, Michael told Cason about a conversation with Piper in which she said to Michael that Cason might be gay and that this may have an impact on the Staples deal. This description of the conversation was essentially true. Piper admitted that she had asked Michael how Eckstein stands “on the gay issue.” She told Michael that she had heard people speculate that Cason was gay and asked if this might affect how Eckstein dealt with them. To the extent that Michael’s opinion that Piper was prejudiced against gay people was premised on this true fact, it is protected speech, regardless of whether the opinion was justified. See National Association of Gov’t Employees, Inc. v. Central Broadcasting Corp., 379 Mass, at 227-28. No other undisclosed fact was so specifically implied from this opinion as to itself be separately actionable.
c. The allegedly defamatory statements by Sumner Ansel that Piper was mentally unstable.
Sumner Ansel’s statements to Cason that Piper was mentally unstable, crazy, and a lunatic cannot, in the context they were made, reasonably be seen as statements of fact. These statements must reasonably be viewed, as they were by Cason, as rhetorical hyperbole or pure opinion, which are not actionable in defamation. See, e.g., Lyons, 415 Mass, at 266-67; Pritsker v. Brudnoy, 389 Mass. 776, 778 (1983).
Cason recalled one disclosed fact that accompanied Sumner’s declarations about Piper’s sanity — that she lived with 200 cats. This alleged fact, which the plaintiffs do not claim to be defamatory, was reasonably understood as the premise, at least in part, for Sumner’s characterization of Piper’s sanity. It is not at all clear whether undisclosed facts were implied in this opinion of her sanity and, if so, what those implied facts specifically were. Consequently, as with the other statements that form the basis for the plaintiffs’ defamation claim, these statements, however pejorative *677 and unjustified, must be viewed as protected opinion not actionable in defamation. The defendants’ motion for summary judgment as to CountV is allowed.
4.Count VI: Intentional Infliction of Emotional Distress
To prevail on a claim of intentional infliction of emotional distress, the plaintiffs must show that “the defendant’s conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.” Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466 (1997), quoting Payton v. Abbott Labs, 386 Mass. 540, 555 (1982). The plaintiffs assert in their complaint that the defendants’ conduct was extreme and outrageous, but they do not identify specifically what they claim the defendants did that rose to this level of extremity and outrageousness. In their opposition to the defendants’ motion for summary judgment, however, they declare that the defendants’ statements to Cason that Piper was anti-Semitic, homophobic, and mentally ill is the conduct they contend was extreme and outrageous.
The Supreme Court has held that constitutionally protected speech cannot form the basis for a claim of intentional infliction of emotional distress even if the speech was patently offensive and intended to inflict emotional injury. Hustler Magazine v. Falwell, 485 U.S. 46, 50 (1988). Where a plaintiff cannot bring a defamation claim because the speech at issue was an opinion protected under the First Amendment, she cannot end rim the First Amendment protection of this form of speech by bringing an intentional infliction of emotional distress claim based on that very same speech. Id. at 55-56.
There is a corollary to the Falwell decision that provides a separate basis to dismiss this claim. Since our First Amendment recognizes the fundamental importance of the free flow of opinions, even unpleasant opinions, the law should not permit the expression of a constitutionally protected opinion, by itself, to constitute conduct that is “extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.” Indeed, a measure of a civilized community is its ability to tolerate the expression of opinions, no matter how distasteful or unpopular.
The defendants’ motion for summary judgment as to Count VI is allowed.
5.Count VII: Concert of Action
The plaintiffs contend that Michael and Sumner Ansel conspired to poison the plaintiffs’ relationships with Lumina and Staples, and thereby drive the plaintiffs out of the Lumina/Staples deal so that Michael could replace the plaintiffs as Lumina’s sales representative to Staples. A claim of civil conspiracy may prevail when there is concerted action between two persons such that liability may justly be imposed on one individual for the tort of the other. Kurker v. Hill, 44 Mass.App.Ct. 184, 188 (1998). There is sufficient evidence in the record, based in part on the proximity in time between the Ansels’ telephone calls to Cason criticizing Piper and Eckstein’s sudden decision to refuse to deal with Piper, to permit this claim of civil conspiracy to go forward. Consequently, the defendants’ motion for summary judgment as to Count VII is denied. Of course, the civil conspiracy claim may focus only on concerted action regarding the claims that survived summary judgment, and may not be used to resurrect in a new form the dismissed defamation and intentional infliction of emotional distress claims.
6.Count VIII: Violation of G.L.c. 93A, §11
In determining whether the defendants engaged in an unfair act or practice in violation of G.L.c. 93A, §11, this Court must consider “whether the practice ... is within at least the penumbra or some common-law, statutory, or other established concept of unfairness” or “is immoral, unethical, oppressive, or unscrupulous.” DatacommInterface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778 (1986) quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975), quoting 29 Fed. Reg. 8325, 8355 (1964). Viewing the evidence in the light most favorable to the plaintiffs, the evidence is sufficient to find that the Ansels acted unfairly as understood in the common law by improperly interfering with Tech Plus’s business and contractual arrangements with Lumina and Staples, and that their conduct in this regard was immoral and unscrupulous.
The Ansels, however, claim that G.L.c. 93A, §11 does not apply to their alleged conduct for three reasons. First, they claim that they were not engaged in trade or commerce, as is required under §11. “Section 11 ‘was intended to refer to individuals acting in a business context in their dealings with other business persons and not to every commercial transaction whatsoever.’ ” Shawmut Community Bank, N.A. v. Zagami, 411 Mass. 807, 814 (1992), quoting Manning v. Zuckerman, 388 Mass. 8, 10 (1983). Here, there is evidence in the record that Michael Ansel, even while still at Tech Plus, had begun his own business as an independent sales representative and was trying to recruit Lumina as a client as part of that nascent business. There is also evidence that Sumner Ansel was an independent sales representative, and was helping his son get started in the business. Consequently, there is adequate evidence to find that both were acting in a business context when they allegedly tried to steal Lumina away from Tech Plus as a client.
Second, the Ansels claim that the conduct alleged to violate c. 93A did not occur primarily and substantially in Massachusetts because Cason was in California when they spoke with him by telephone. However, the Ansels were both in Massachusetts when they called Cason, and the focus of their efforts was to *678 replace Tech Plus, whose principal place of business was in Massachusetts, as Lumina’s sales representative. This is sufficient to raise a triable issue on this element ofa c. 93A claim. See generally Makino, U.S.A., Inc. v. Metlife Capital Credit Corp., 25 Mass.App.Ct. 302, 308-11 (1988).
Third, the Ansels contend that a c. 93A claim, with its potential for attorneys fees and treble damages, are not permitted for what is essentially a defamation claim, where the law permits only actual damages. It is indeed true that, by statute, claims for defamation are limited to actual damages sustained. G.L.c. 231, §93. It is also true that the Supreme Judicial Court has held that, as a matter of constitutional law, a plaintiff in a defamation case is limited to actual damages, recognizing that allowing damage claims in excess of actual damages “may impermissibly chill the exercise of First Amendment rights by promoting apprehensive self-censorship." Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 860 (1975). Although the Supreme Judicial Court has declared in dictum that “(d]efamatory statements are actionable under G.L.c. 93A,” Dulgarian v. Stone, 420 Mass. 843, 853 (1995), I may have granted summary judgment on the c. 93A claim under the principles set forth by statute and in Stone if the c. 93A claim had rested solely on a claim of defamation. It does not. Rather, as stated earlier, it is focused on the Ansels’ overall conduct in attempting improperly to interfere with the plaintiffs’ business relationships with Staples and Lumina; the derogatory statements form only a part of that overall conduct. Since it is the interference, not simply the alleged defamation, that is the crux of the c. 93A claim, the plaintiffs need not be limited to actual damages on this claim. Therefore, the defendants’ motion for summary judgment as to Count VIII is denied.
II. PLAINTIFFS’ MOTION FOR SUMMARY JUDGMENT ON THE COUNTERCLAIM
Michael Ansel has filed a nine-count counterclaim against the plaintiffs; Sumner Ansel joins in only the first count. I address each count in order.
1. Count I: Abuse of Process
‘To prevail on an abuse of process claim ‘it must appear that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed.’ ” Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 775 (1986), quoting Beecy v. Pucciarelli, 387 Mass. 589, 595 (1982), which quotes Quaranto v. Silverman, 345 Mass. 423, 426 (1963). The Ansels have failed to articulate what illegitimate ulterior purpose the plaintiffs have intended to accomplish through the filing of their complaint. In their counterclaim, the Ansels appear to declare only that the plaintiffs filed their complaint in order to “wrongfully coerce” Michael Ansel into not filing a complaint against Piper. Since the Ansels have presented no evidence that Michael was contemplating any legal claim against Piper or that Piper believed that such a claim was being contemplated, and since Massachusetts law liberally permits counterclaims, this argument is preposterous on its face. Consequently, summary judgment shall be allowed on Count I.
2. Count II, III, and IV; Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, and Tortious Breach of Contract
Michael Ansel contends that Tech Plus, through Piper, entered into an employment agreement with him whereby he was to be paid 40 percent of the 3.5 percent commission that Tech Plus was to earn on sales of the Lumina 2000. He claims that Piper forced him out of Tech Plus in order to avoid paying him those commissions, which he estimated to be at least $80,000, thereby breaching his employment contract and its implied covenant of good faith and fair dealing.
However, at his deposition, Michael testified differently from the allegations in the counterclaim. There, he stated that, when he first began with Tech Plus, he and Piper orally agreed that he would receive at least 40 percent of Tech Plus’s 3.5 percent commission. They did not agree on any set percentage for Michael’s commission, but agreed simply that they would abide by the standard in the industry and “hammer it out when we get to that point,’’ which they never did. Since this Court is obliged in considering the plaintiffs’ summary judgment motion to view the evidence in the light most favorable to the defendants, this Court must assume, based solely on Michael’s deposition testimony, that there was indeed an oral employment agreement whereby Michael was to be paid the standard commission in the industry for sales he obtained.
Yet, even with this assumption, these three contract-related claims cannot survive summary judgment. There is no dispute that Michael was an at-will employee and could be terminated at any time, provided the termination was not discriminatory, contrary to public policy, or intended to deprive him of earned compensation or benefits. See, e.g., Jackson v. Action for Boston Community Dev, Inc., 403 Mass. 8, 9 (1988). In his deposition, Michael admitted that he had not earned any commissions before he left Tech Plus and that there were no commissions in the pipeline.[3] Consequently, he cannot contend that he was constructively terminated to deprive him of compensation or benefits that had been earned or were “on the brink” of being earned. Compare with Fortune v. National Cash Register Co., 373 Mass. 96, 104-05 (1977) (termination contrary to public policy when designed to deprive salesman of commissions that are earned or “on the brink” of being earned); McCone v. New England Telephone & Telegraph Co., 393 Mass. 231, 234 (1984) (goal is to deny employer any readily definable *679 financial windfall resulting from denial of compensation to terminated employee for past services).
Nor can Michael claim a breach of contract or of the implied covenant of good faith and fair dealing premised on his allegation that he was forced out of his job because of Piper’s discrimination against him based on his gender and religion. G.L.c. 151B provides the exclusive remedy for such a claim of employment discrimination. Charland v. Muzi Motors, Inc., 417 Mass. 580 (1994).
In short, as an at-will employee, Michael cannot claim that he was forced out of his job to prevent him from earning commissions that he would have earned had he remained, especially when he attempted unsuccessfully to prevent his employer from earning those very same commissions. The motion for summary judgment must be allowed as to Counts II, III, and IV.
3.CountV: Negligence
The negligence claim alleges that the plaintiffs were “negligent” by discriminating against Michael Ansel on the basis on his gender and religion. This is simply a claim of employment discrimination dressed under a different name. The exclusive remedy for such a claim is Chapter 15IB. Charland v. Muzi Motors, Inc., 417 Mass. 580 (1994). Summary judgment on this claim is allowed.
4.Counts VI, VII, and VIII: Employment Discrimination
Michael Ansel alleges employment discrimination based on his gender and religion under three separate statutes: 42 U.S.C. §2000e-2, G.L.c. 151B, and G.L.c. 93, §102. Ansel concedes that c. 151B is applicable to his claim of employment discrimination and, where applicable, it is the sole statutory remedy for such discrimination under Massachusetts law, supplanting any similar claim under the Equal Rights Act, c. 93, §102. Charland, 417 Mass, at 582-86. Summaiyjudgment, therefore, must be allowed as to Count VIII, seeking relief under the Equal Rights Act.
With respect to the appropriate federal and state statutory remedies, both establish an administrative procedure for their enforcement that requires the filing of a complaint with the Equal Employment Opportunity Commission (“EEOC”) or the Massachusetts Commission Against Discrimination (“MCAD”) within six months of the last act of discrimination. See 42 U.S.C. §2000e-5(e); G.L.c. 151B, §5. Michael Ansel admits that he never filed a complaint with the EEOC or MCAD; he said he thought about it but “didn’t want to.”[4]
It is plain that, by failing to file a timely complaint with the EEOC or the MCAD, Michael is barred from bringing a complaint in court against Piper or Tech Plus alleging discrimination. See, e.g., Charland, 417 Mass, at 583-84. Michael, while essentially conceding this point, argues that, under G.L.c. 260, §36, he may bring the discrimination claims as counterclaims limited to recoupment of the plaintiffs’ claim against him. Under §36:
The provisions of law relative to limitations of actions shall apply to a counterclaim by the defendant
Notwithstanding the provisions of the first paragraph of this section, a counterclaim arising out of the same transaction or occurrence that is the subject matter of the plaintiffs claim, to the extent of the plaintiffs claim, may be asserted without regard to the provisions of law relative to limitations of actions.
G.L.c. 260, §36.
This statute cannot breathe life into Michael’s expired discrimination counterclaims, because the counterclaims of discrimination do not arise out of the “same transaction or occurrence that is the subject matter” of the plaintiffs’ complaint. Those claims, to the extent focused on Michael, all concern Michael’s conversations with Cason and, perhaps, Eckstein at the end of his employment with Tech Plus and in the months following. Michael does not contend that his discrimination claims arose out of those conversations. Nor could he so contend, since Piper was not even present when those conversations took place. The mere fact that Michael’s conversations with Cason and, perhaps, Eckstein discussed Piper’s alleged discrimination against him does not mean that his discrimination claims arose from those conversations. See Kopf v. Chloride Power Electronics, Inc., 882 F.Supp. 1183, 1188 (D.N.H. 1995). Summary judgment, therefore, shall also be allowed as to Count VI, seeking relief under 42 U.S.C. §2000e-2, and Count VII, seeking relief under G.L.c. 151B, §4.
5.Count IX: Unfair Trade Practices in Violation of G.L.c. 93A, §11
Michael Ansel contends that the defendants’ conduct constituted an unfair trade practice in violation of G.L.c. 93A, §11. It is well established that c. 93A does not apply to disputes arising out of an employment relationship between an employee and his employer or among two employees of that corporation. Manning v. Zuckerman, 388 Mass. 8, 14 (1983). Michael Ansel, in his deposition, admitted that this claim is focused solely on his allegation that he is owed commissions by Tech Plus, and does not concern any matter that arose outside of his employment relationship with Tech Plus. Summary judgment, therefore, must be granted on this count.
ORDER
For the reasons detailed above, this Court ORDERS that:
1. As to the complaint, the defendants’ motion for summary judgment is ALLOWED as to Counts v. and VI, and DENIED as to Counts I, II, III, IV, VII, and VIII.
*680 2. As to the counterclaim, the plaintiffs’ motion for summary judgment is ALLOWED as to all counts.

 Although I generally do not refer to parties by their first name, I do so here because there are two Ansels involved in these events, and it is easier to distinguish them if I use their first names.

 There may indeed have been other reasons that Michael gave, but Cason’s memory of the conversation is too hazy specifically to recall them.

 In an affidavit filed with his opposition to summary judgment, Michael Ansel attests, albeit only by implication, that he had already earned his commission by obtaining Staples’ approval to test market Lumina’s new product. An affidavit contradicting admissions in a party’s own deposition testimony may not be used to create a disputed issue of fact in the absence of newly discovered evidence or other limited exceptional circumstances not found here. Hanover Insurance Co. v. Leeds, 42 Mass.App.Ct. 54, 58-59 (1997); Bergendahl v. Massachusetts Electric Company, 45 Mass.App.Ct. 715, 717 n. 2 (1998). Consequently, I shall consider the Ansel affidavit only to the extent it does not contradict his sworn deposition testimony.

 The complaint in this case was filed on August 6, 1996, nearly nine months after Michael Ansel quit his employment with Tech Plus. No complaint had been filed with the EEOC or the MCAD at the time the complaint was filed; nor was one filed before the counterclaim alleging discrimination was filed on August 20, 1996.