In re SCALLYWAGS, INC., Debtor,

SCALLYWAGS, INC., Plaintiff,

v.

Eugene J. SWEENEY, Jr., and Elaine I. Sweeney, Defendants.

Bankruptcy No. 87–40206–JFQ.
Adv. No. 87–4046.

United States Bankruptcy Court, D. Massachusetts.

April 8, 1988.

Richard P. Salem, Leicester, Mass., Stephen G. Abraham, Worcester, Mass., for debtor/plaintiff.

Robert J. O'Keefe, John W. Connors, Worcester, Mass., for Eugene Sweeney and Elaine Sweeney, defendants.

## FINDINGS OF FACT AND
## RULINGS OF LAW

JAMES F. QUEENAN, Jr.,
Bankruptcy Judge.

This is a complaint brought by the Debtor against its landlords, Eugene J. Sweeney

(the "Defendant") and Elaine I. Sweeney (collectively the "Defendants"), seeking an order returning the Debtor to possession of its business premises and granting the Debtor damages for the Defendants' dispossession of the Debtor. Preliminary relief was granted almost a year ago returning the Debtor to possession. The Court has since conducted a trial on the Debtor's damage claim and on the Defendants' counterclaim. This opinion contains the Court's findings of fact and rulings of law on those matters.

## I FACTS

The Debtor has conducted a pub-style restaurant under a lease from the Defendants. The Debtor's president and sole stockholder, Robert J. Bradley ("Bradley"), is a schoolteacher who began the business in 1985. During its first year of operations, the Debtor realized an income which was enough to cover expenses plus principal and interest payments on a loan it had taken out for renovations.

Bradley soon tired of the business and decided to sell. He entered into sales negotiations with one Mark Feeley ("Feeley"). In November of 1986, Bradley allowed Feeley to assume management of the Debtor while the parties continued working on final arrangements for a sale. Feeley had yet to obtain a commitment for the necessary financing. No formal purchase and sales agreement was signed, although the parties did arrive at an agreement in principle. They initially discussed a price of $150,000, which included assumption of all the Debtor's debts. Later discussions mentioned other prices. Feeley managed the operations of the business for several months as an employee of the Debtor, also injecting funds of his own and of his parents into the business. During this period, Feeley had a number of occasions to speak to the Defendant on matters concerning the lease. They worked out an arrangement whereby Feeley, through the Debtor, paid an additional $500 per month to be credited to the Debtor's obligation under the lease to pay all real estate taxes.

By late March of 1987, Feeley and the Defendant were discussing the possibility of Feeley operating a pub-style restaurant on the premises under a lease of his own without purchasing the business of the Debtor. The Defendant planted the seed in Feeley's mind for such a plan, telling Feeley that he would cooperate in the transfer of all licenses from the Debtor to Feeley or Feeley's corporation. Feeley decided to terminate operations of the Debtor as of April 1, and not to pay the April rent on behalf of the Debtor.

Feeley withdrew $6,500 from the Debtor's checking account on April 1, all in cash. This left a small balance in the Debtor's account. He did not pay the April rent, due April 1. Neither Feeley nor the Defendant told Bradley of this. On April 4, the Defendant wrote to Bradley as follows:

> The rent for the month of April 1987 not having been paid, you are herewith notified that your lease is herewith terminated under the provisions of your lease. You are herewith notified to remove yourself from the premises forthwith. Pursuant to the provisions of the lease, I shall make entry on the Premises and retake possession thereof.

On April 8, Feeley gave the Defendant a check for $2,436.00 from his own funds in payment of taxes due under the lease. Feeley turned the keys over to the Defendant on April 13, and the locks were thereafter changed. Feeley continued to have access to the premises, but the Debtor did not. On or about April 17, Feeley paid the April rent (plus $500 for taxes) by giving the Defendant $5,500 in cash from the $6,500 he had withdrawn in cash on April 1. At about this time Feeley also paid the Defendant $886.27 by check in payment for insurance due under the lease.

Feeley made all of these April payments pursuant to an agreement between Feeley and the Defendant that Feeley would stay on as a tenant at will until the Worcester License Commission granted Feeley or his corporation a license for the premises, at which time Feeley and the Defendant planned to sign a new lease. The Defend-

ant carried through on his commitment to Feeley to help him obtain the necessary licenses. On April 13, the Defendant wrote the Commission informing it that the Debtor's tenancy and occupancy had been terminated. He also wrote to the Commission on that date telling it that Feeley's corporation was his tenant and that the corporation was authorized to make application for all licenses necessary to conduct a restaurant at the premises. At about this time Feeley began the application process with the Commission.

Even though the Defendant had already repossessed the premises, the Commission (one of whose members was the Defendant's lawyer) required the Defendant to evict the Debtor through court process. Accordingly, on April 28, 1987 the Defendant began an eviction action in state court, alleging in his pleading that the Debtor had not paid the April rent. The Debtor, in the meantime, had filed a Chapter 11 petition with this Court on April 20. The present adversary proceeding was initiated shortly thereafter, and the court granted preliminary relief in the form of returning possession to the Debtor. Feeley had in the meantime paid rent for May. He was on the premises but not operating a restaurant (the necessary license not having been yet granted) when the Debtor regained possession in May and ousted him.

## II ILLEGAL EVICTION

At the preliminary injunction hearing, the Court ruled that the Defendant's April 4 notice was an insufficient notice to quit under Mass.Gen.L. ch. 186, § 11, and that, in any event, the statute required expiration of 14 days after the notice before a landlord acquired a right to possession. The Court also ruled that the Defendant had violated Mass.Gen.L. ch. 186, § 18 by recovering possession other than through statutory summary process procedure, and that this statutory violation had occurred even if the notice were proper and the 14 day period had expired. These rulings were based in part on the obvious conclusion that Feeley's action in turning possession over to the Defendants was not an authorized action on behalf of the Debtor.

Those rulings are, in any event, the law of this case.

## III INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS WITH FEELEY

■ The Debtor argues that the Defendant did more than illegally evict the Debtor; it asserts that the Defendant's conduct also constituted tortious interference with the Debtor's prospective contractual relations with Feeley. One who intentionally and without justification interferes with another's prospective contractual relations, by inducing a third person not to enter into a prospective contract, is liable to the other for harm resulting from loss of the benefits of the relation. *See Chemawa Country Golf, Inc. v. Wnuk,* 9 Mass.App.Ct. 506, 510, 402 N.E.2d 1069, 1072 (1980); *Restatement (Second) of Torts* § 766B. It may well be that Feeley, even if he had the necessary financing, would have decided against purchasing without regard to any conversations he had with the Defendant. But we are satisfied, having heard and observed Feeley and the Defendant testify, that the Defendant's words of encouragement to Feeley not to purchase the Debtor's business and to lease the premises on his own were a substantial causative factor in Feeley's decision. The Defendant did far more than to indicate to Feeley, in response to Feeley's inquiry, that he would be willing to sign a lease with him. He planted the seed for the plan. The Defendant's actions, moreover, in so abruptly and illegally evicting the Debtor, and at the same time receiving payments from Feeley, reek of a carefully planned, joint scheme between the two. The same may be said of the Defendant's action concerning the Worcester License Commission.

The Defendant's interference was intentional and without justification. He purposefully interfered with a vital interest of a party with whom he already had a relationship with as a tenant. Furthermore, he knew his conduct would end all hope that the Debtor had to sell its business to Feeley. *Cf. Restatement (Second) of Torts*

§ 767 (discussing factors which make interference "improper").

## IV CAUSATION AND DAMAGES

### A. *Causation*

The Debtor's restaurant is no longer operating. The Debtor reopened the restaurant shortly after gaining possession last Spring; it operated for several months until November 21, 1987. This was done under an arrangement the Debtor had with one Jonathan Jackson ("Jackson"). Jackson has substantial experience in the restaurant business; he also has experience concerning Chapter 11 reorganizations, and was represented by a lawyer well versed in that branch of the law. Jackson wanted to purchase the business through a Chapter 11 plan. He took over as manager of the restaurant, and on July 16, 1987 he proposed a Chapter 11 plan having these features: payment in full of all priority and secured debts; payment in full of all debts personally guaranteed by Bradley; payment of 25% of all other debts; and payment of $100 to Bradley for his stock.

Jackson made no attempt to obtain acceptance and confirmation of this plan because he wanted a long-term lease with the Defendants. He and the Defendant negotiated the terms of such a lease for several months. On or about November 21, 1987, Jackson received a draft of a lease from the Defendant which Jackson considered inconsistent with their negotiations to date. He promptly terminated further negotiations and closed the business down. There appear to be no present prospects for the Debtor to either operate or to sell its business.

 We conclude that both of the wrongs committed by the Defendant, the wrongful eviction and the interference with the prospective relationship with Feeley, were substantial causes of the Debtor's ultimate business demise. We begin with the Defendant's conduct with Feeley.

It was of course perfectly possible that Feeley would not have bought the business anyway; he and the Debtor were not in complete agreement on all terms, and he had not yet obtained his financing. We find, however, that it is more likely than not that some sales agreement would have been made with Feeley had it not been for the Defendant's interference. The Defendant argues that the appearance of Jackson as a prospective buyer cuts the chain of causation. We fail to see how. Feeley continued to be lost as a buyer. If Jackson had purchased the business, the purchase would certainly have reduced the Debtor's damages, or eliminated them altogether. But the appearance and disappearance of Jackson as a prospect did not change the fact that Feeley was no longer a prospective buyer because of the Defendant's conduct.

The effect of the wrongful eviction also continued to the date the business closed in November. The eviction caused the business to close immediately, and to remain closed for about two months. Although it reopened later, the Debtor never fully recovered from the effects of having been closed. Despite Jackson's substantial experience in the restaurant business, the Debtor under his management could not reach the sales volume it had enjoyed prior to being closed for two months in the Spring. (See this Court's findings of fact of December 22, 1987 on Debtor's motion to assume the lease). Even if the Debtor's difficulties before the closing in the Spring were sufficient of themselves to bring about its demise, the Defendant is still responsible if his conduct was also sufficient to produce the same result, and if the effect of that conduct was actively operating at the time the business closed. *See O'Connor v. Raymark Industries, Inc.,* 401 Mass. 586, 518 N.E.2d 510 (1988); *Gidwani v. Wasserman,* 373 Mass. 162, 365 N.E.2d 827 (1977) (Landlord held responsible for burglary loss caused in part by landlord's illegal dispossession of tenant without notice). *See also Restatement (Second) of Torts* § 435A.[1]

---

1. *Restatement (Second) of Torts* § 435A reads as follows:

A person who commits a tort against another for the purpose of causing a particular harm to

## B. *Damages*

The Debtor did not bear its burden of proof concerning damages caused by the Defendant's interference with the prospective contractual relation with Feeley. There was no evidence of what the likely sales price would have been, so that Court has no foundation to determine the value of the benefit from the relationship with Feeley which the Debtor lost. Nor has the Debtor sustained its burden of proof concerning the value of its business apart from the benefit that it was likely to derive from Feeley. The Court granted the Defendants' motion to strike Jackson's testimony on this because Jackson's experience has been in the operation of restaurants rather than in their purchase and sale.

The lack of evidence of damages caused by the loss of Feeley as a prospective buyer does not, however, foreclose the issue of the Debtor's damages. There was sufficient evidence of damages caused by the wrongful eviction. When a tenant with a business is wrongfully ejected from the premises by a landlord, he may recover damages flowing from the interruption of his business, including any expenses incurred or necessary to incur in order to re-establish the business. *See Kostapolos v. Pezzetti*, 207 Mass. 277, 93 N.E. 571 (1911). Where the harm complained of is pecuniary harm, a court must, in effect, set up a balance sheet, and consider compensation for all of the following: (a) harm to property, (b) harm to earning capacity, and (c) the creation of liabilities. *Restatement (Second) of Torts* § 906 & comment a. There was insufficient evidence of the Debtor's earning capacity. But the Court does have competent evidence concerning the other elements. Jackson testified that the following $55,000 investment would be required in order for the Debtor to reopen its business:

— Used equipment need to replace broken and missing equipment — $10,000
— Opening Inventory — 10,000
— Substantial advertising to promote a new name — 10,000
— Expense of initial opening such as training of employees, etc. — 10,000
— Losses during initial operations — 15,000

Total — $55,000

There is no credible evidence linking the Defendant to any missing or broken equipment. Nor should the Defendant be charged with the cost of an opening inventory; inventory has to be purchased in any event. The other elements of damages, however, appear credible, and the court finds that they exist. Thus the Debtor has been damaged in the sum of $35,000 due to the illegal eviction.

## V DEFENDANTS' COUNTER CLAIM

The Defendants seek $70,700 in damages, broken down as follows: $23,700 for rent for the month of May, 1987 and the months of November, 1987 through February, 1988; $5,000 for insurance for the policy year ending in November of 1987; taxes of $12,000 for all of fiscal 1987 and the first half of fiscal 1988; $30,000 for lost, stolen or damaged equipment.

The Court allows this claim as a first priority claim, but only in the sum of $36,200. The May rent of $4,500 was paid, based upon the binding admission made in open court by the Defendants' prior counsel during a hearing on assumption of the lease. The $30,000 claim for lost, stolen or damaged equipment is disallowed completely because the Defendants have neither established this amount with reasonable certainty nor have they shown that the Debtor is responsible for any such loss or damage.

The allowed claim of $36,200 is, however, subordinated to all priority and non-priority claims against the estate. Total subordination is ordered under principles of equitable subordination pursuant to 11 U.S.C. § 510(a) by reason of the Defendants' illegal and inequitable conduct in dispossessing the Debtor and in interfering

the other is liable for such harm if it results, whether or not it is expectable, except where the harm results from an outside force the risk of which is not increased by the defendant's act.

with his prospective contractual relations with Feeley. Although equitable subordination more often applies to the claims of insiders who control a debtor's operations, § 510(a) equally subordinates the claims of landlords who through their inequitable acts so burden a debtor's reorganizational efforts that the debtor faces unnecessary additional obstacles. Equitable subordination is most appropriate in the present circumstances; the Defendant's conduct is the cause of these claims not having been paid from operating revenue. And that conduct was sufficiently egregious to be classified as gross misconduct necessary to subordinate the claim of a non-insider. *See Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Services, Inc.),* 29 B.R. 139 (Bankr.E.D.N.Y.1983). *Cf., e.g., Wilson v. Huffman (In re Missionary Baptist Foundation of America) Inc.,* 712 F.2d 206, 212 (5th Cir.1983) (equitable subordination of claim requires findings of: (1) inequitable conduct by creditor; (2) injury to other creditors or unfair advantage as result of such conduct; and (3) no inconsistency with provisions of Bankruptcy Code); *In re Beverages International Ltd.,* 50 B.R. 273 (Bankr.D.Mass.1985) (discussing similar standards).

A separate order and judgment has issued.