Brassard, J.
INTRODUCTION
Plaintiff Citizens for Citizens, Inc. filed the present action against the City of Fall River and Mayor Edward M. Lambert, Jr. seeking to recover $79,668 plus interest for the training of workers in asbestos removal and encapsulation and the removal of asbestos from the Fall River public schools.' This motion is before the court on the defendants’ motion for summary judgment pursuant to Mass.R.Civ.P. 56. For the following reasons, the defendants’ motion for summary judgment is ALLOWED.
*36 BACKGROUND
The undisputed material facts as revealed by the summary judgment record are as follows. Plaintiff Citizens for Citizens, Inc. (CFC) is a non-profit Massachusetts corporation which provides community social services to low- and moderate-income residents of Fall River through various programs which are state and federally funded. (Plain. Ex. B ¶2.) In May of 1989, CFC developed an asbestos abatement training program to train unemployed individuals in the removal and handling of asbestos. The Federal Asbestos Hazard Emergency Response Act of 1986 requires the removal of asbestos from public schools. CFC contracted with the Bristol County Training Consortium to provide partial federal funding for its asbestos removal program under the Federal Job Training Partnership Act (JTPA). (Plain. Ex. B ¶5.)
CFC contacted the Fall River School Committee to determine whether the City would partially subsidize the training program and allow trainees to use public school buildings as training sites for hands on training. (Plain. Ex. B ¶6.) In August of 1989, Daniel Rapoza (Rapoza), the Director of Buildings and Grounds for the Fall River Public Schools, requested a special school committee meeting to discuss a request by CFC for the use of one or two schools for job training in asbestos removal. (Plain. Ex. C.) At a special meeting on August 15, 1989, the School Committee unanimously voted to accept a proposal by CFC to remove asbestos from the Morton Middle School for approximately $90,000, a significant discount from the estimated $140,000 cost of the work. (Plain. Ex. D.) Defendant Edward Lambert (Lambert), presently the Mayor of Fall River, was a member of the School Committee at that time and voted in favor of the proposal. (Plain. Ex. D.)
The City never placed the contemplated asbestos removal work out to bid. (Def. Ex. H.) Instead, on February 16, 1990, the City and CFC entered into Contract #90-527 for “Classroom Training to Conduct Removal, Repair and Encapsulation of Asbestos in Various Schools.” (Def. Ex. G.) The work to be performed by CFC was described as:
To allow Citizens for Citizens, Inc. to conduct removal, repair and encapsulation of asbestos in various schools, in conjunction with JPTA training funds. All classroom training will take place at locations other than school department facilities. All hands-on job training will take place in school ■ facilities as agreed upon by the Director of Buildings and Grounds and the representatives of Citizens For Citizens, Inc. Attached specifications as prepared by Briggs Associates, Inc. will be adhered to, as well as, all applicable City, State and Federal regulations. (Def. Ex. G.)
Pursuant to the contract, the work was to begin on February 16, 1990, with all asbestos removal to be completed prior to June 30, 1990. (Def. Ex. G.) Article I of the contract stated:
Contractor shall complete all work as specified in the Contract Documents. The work is described as asbestos abatement and related work [sic] the City of Fall River at the following schools: Morton School, Lincoln School, Connell School, Coughlin School, Kuss Middle School. (Def. Ex. G.)
The contract was signed by the mayor of Fall River on March 5, 1990. (Def. Ex. G.)
Thereafter, the City and CFC entered into several extensions of Contract #90-527. On August 1, 1990, Rapoza submitted a request to Superintendent of Schools John Correiro (Correiro) to extend Contract #90-527 for the encapsulation, removal and disposal of asbestos material at the Letourneau, Morton and Spencer Borden Schools in a sum not to exceed $75,000 to be paid from Fiscal 1991 funds. (Plain. Ex. F.) On August 6, 1990, the School Committee voted to extend Contract #90-527 with CFC “for the encapsulation, removal and disposal of asbestos material at the Letourneau, Morton and Spencer Borden Schools.” (Plain. Ex. H.)
On July 17, 1991, Rapoza submitted a request to Correiro to extend Contract #90-527 for the encapsulation, removal and disposal of asbestos material in a sum not to exceed $50,000 to be paid from Fiscal 1992 funds. (Plain. Ex. G.) On July 23, 1991, the School Committee voted to extend the contract with CFC “for the encapsulation removal and disposal of asbestos material.” (Plain. Ex. I.)
The following year, by memorandum dated July 29, 1992, Rapoza notified Correiro that “The job training program conducted annually by Citizens for Citizens, Inc. has been approved . . . This contract will not exceed Seventy-Five Thousand Dollars ($75,000.00) and will be paid from Fiscal 1993 Funds.” (Plain. Ex. J.) Similarly, by memorandum dated August 18, 1993, Rapoza notified Acting Superintendent of Schools James Gibney (Gibney) that “The job training program conducted annually by Citizens for Citizens, Inc. has been approved . . . This contract will not exceed Seventy-Five Thousand Dollars ($75,000.00) and will be paid from Fiscal 1994 Funds.” (Plain. Ex. K.)
Thereafter, by memorandum dated August 3, 1994, Rapoza notified Gibney that “The job training program conducted annually by Citizens for Citizens, Inc. has been approved . . . This contract will not exceed Fifty-Thousand Dollars ($50,000.00) and will be paid from Fiscal 1995 Funds.” (Plain. Ex. L.) On September 1, 1994, a contract extension for asbestos removal and repair at the Doran, Silvia, Coughlin and Stone Schools was signed by the members of the School Committee, Gibney and Mayor John R. Mitchell, with Rapoza certifying that funds in the amount of $75,000 were available in G.L. Account #001-207-5210-00. (Plain. Ex. U.) On July 14, 1995, CFC sent the City a letter stating:
*37 Consider this to be our invoice for the reinspection of Fall River Public Schools as required by the Asbestos Hazard Emergency Response Act (AHERA) legislation as administered by the U.S. Environmental Protection Agency . . . Charges for the reinspection are $22,300.00. (Plain. Ex. S.)
In addition, on August 22, 1995, CFC sent the City an invoice in the amount of $77,502.95 for asbestos abatement performed at the Matthew J. Kuss Middle School, Coughlin School and Frank M. Silva School. (Plain. Ex. T.)
On August 31, 1995, a contract extension for asbestos removal and repair at various schools was signed by Gibney and Mayor Mitchell, with Rapoza certifying that funds in the amount of $100,000 were available in G.L. Account #001-207-5210-00. (Plain. Ex. V.) The following year, on August 5, 1996, a contract extension for asbestos removal and repair at various schools was signed by Gibney and Mayor Edward Lambert, with Rapoza certifying that funds in the amount of $55,000 were available in G.L. Account #001-207-5210-00. (Plain. Ex. W.) Each year between 1989 and 1996, Fiscal Years 1990 through 1997, CFC was paid in full by the City for the asbestos training and removal it provided.
In 1997, CFC submitted another proposed contract extension for “Asbestos removal and repair at various schools to be determined not to exceed Seventy-Four Thousand Dollars ($74,000.00) and to be paid from Fiscal 1998 funds.” Although this contract extension was signed by Gibney with Rapoza certifying that funds in the amount of $74,000 were available in G.L. Account #001-207-5210-00, the contract extension was never signed by Mayor Lambert. (Def. Ex. A.) Pursuant to Section 2-716 of the Fall River Revised Ordinances:
No contract between any party and the city shall be finally completed, valid and binding on the city unless previously signed by the mayor and also by the officer or the head of the department or the chairman of the board, as the case maybe, making the contract, and approved in writing as to form and manner of execution by the corporation counsel. (Def. Ex. F.)
At the City’s request, CFC began performing work for fiscal year 1998 prior to receiving a final signed contract extension. (Plain. Ex. B ¶¶14, 15.) The work was time sensitive, as the job training had to be completed during the public schools’ vacation, and the final reinspection report had to be completed in accordance with federal regulations. (Plain. Ex. B ¶ 16.) CFC expected to be paid for the services performed in 1997 because it knew that the School Department had appropriated the money and the City regularly asked vendors to undertake work prior to finalizing the written contract. (Plain. Ex. B ¶14.) On August 22, 1997, CFC sent the City an invoice in the amount of $55,668.12 for asbestos removal and disposal from five different schools. (Plain. Ex. R.)
The City apparently began investigating whether it was legally obligated to pay for the services provided by CFC in 1997. On November 7, 1997, Rapoza sent Fall River Assistant Corporation Counsel Mary O’Neil (O’Neil) a letter stating:
The extension of contract #90-527 with the City of Fall River School Department and Citizens for Citizens Incorporated is as a result of the local Joint Partnership Training Act and C.F.C. entering into an agreement annually to train a number of economically disadvantaged individuals in the inspection, installation, and removal of asbestos . . . The School Department enters into a contract annually to share expenses for the transportation, air quality testing, instruction and supervision of the partici-' pants, as well as receiving the benefit of the removal of asbestos from our facilities at a substantial reduction in cost. (Plain. Ex. M.)
In 1997, CFC had a second contract with the City to provide an asbestos re-inspection report as required under federal law. (Plain. Ex. B ¶ 11.) Between July and December of 1997, Ronald Miller, CFC’s Director of Education and Training, visited and inspected all thirty-six Fall River public schools, analyzed the asbestos situation in each school and prioritized problem areas in a 300-page report which was delivered to the City in June of 1998. (Plain. Ex. B, ¶7, 8.) On June 8, 1998, CFC sent the City an invoice for Asbestos Hazard Emergency Response Act (AHERA) re-inspection reports in the amount of $24,000. (Plain. Ex. O.) The City’s budget for Service Contracts in Fiscal Year 1998 included $65,000 for “Asbestos Training/Removal” by CFC and $25,000 for “Asbestos Report” by CFC. (Plain. Ex. Q.)
In August of 1998, the City solicited bids for “Furnishing Asbestos Removal and Repair in various city schools, City of Fall River in accordance with specifications.” (Def. Ex. B, C.) Several companies, including CFC, picked up the bid specifications. However, CFC never submitted a bid on the contract. (Def. Ex. H.) On August 17, 1998, the City awarded the contract to Fleet Environmental Services, who had submitted the lowest bid of $23,941. (Def. Ex. D, I.)
By letter dated October 19,1998, the City informed CFC that it could not pay the bill for the 1997 asbestos removal because the work done did not comply with the competitive bidding laws, G.L.c. 149, §44A, and because the bills submitted contained discrepancies in the prices charged. (Plain. Ex. A.)
CFC filed the present suit on March 4, 1999, seeking a declaratory judgment in Count I of the complaint that the 1997 contract extension is legal and binding on the City. Count II of the complaint alleges that Lambert intentionally interfered with CFC’s contractual and advantageous business relations with the *38 City, Count III alleges negligence and breach of contract against Lambert personally, and Count IV seeks to hold the City and Lambert personally liable' for the sums owed under a theory of promissory estoppel. The defendants now move for summary judgment on all counts.
DISCUSSION
This court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouwacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the nonmoving party must respond and allege specific facts establishing the existence of a genuine issue of material fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). The nonmoving party cannot defeat the motion by resting on his or her pleadings and mere assertions of disputed facts, but must offer admissible evidence which, if credited by the fact finder, would be sufficient to support a finding in that party’s favor. LaLonde v. Eisner, 405 Mass. 207, 209 (1989).
The City moves for summary judgment on Count I of the complaint for declaratory judgment on the ground that the alleged 1997 contract extension under which CFC seeks $55,668.12 for asbestos removal and disposal is unenforceable. The declaratory judgment procedure set forth in General Laws Chapter 231 A, §1 may be used to secure a determination of parties’ rights, duties and status under a written contract, including questions of the validity thereof. G.L.c. 231A, §2 (1986). General Laws Chapter 43, section 29 provides in relevant part:
All contracts made by any department, board or commission where the amount involved is five thousand dollars or more shall be in writing, and no such contract shall be deemed to have been made or executed until the approval of the mayor under Plan A, B, C or F . . . is affixed thereto. G.L.c. 43, §29 (1989).
The Fall River School Committee is a “department” or “board” within the meaning of this provision. Eastern Mass. Street Railway Co. v. Mayor of Fall River, 308 Mass. 232, 234 (1941).[2]
In addition, Section 2-716 of the Fall River Revised Ordinances provides that “No contract between any party and the city shall be finally completed, valid and binding on the city unless previously signed by the mayor.” Persons dealing with a municipality must take notice of limitations of this kind upon the contracting powers of the municipality, are bound by them, and cannot recover upon contracts attempted to be made in violation thereof. Malborough v. Cybulski, Ohnemus & Assoc., Inc., 370 Mass. 157, 160 (1976); Adalian Brothers, Inc. v. Boston, 323 Mass. 629, 631 (1949). Accordingly, the 1997 extension of Contract # 90-527 was invalid and unenforceable because it was not signed by the mayor.
The City further moves for summary judgment on the ground that the purported 1997 contract extension is void and unenforceable due to noncompliance with the competitive bidding statutes. The City contends that Contract #90-527 and the 1997 extension were subject to competitive bidding pursuant to G.L.c. 149, §44A(2), which provides in relevant part:
Every contract for the construction, reconstruction, installation, demolition, maintenance or repair of any building by a public agency estimated to cost more than twenty-five thousand dollars . . . shall be awarded to the lowest responsible and eligible general bidder on the basis of competitive bids in accordance with the procedure set forth in the provisions of section forty-four A to forty-four H, inclusive. G.L.c. 149, §44A(2) (1998).
General Laws Chapter 149 section 44D(10) further provides:
All applications submitted by contractors for certification in the category of asbestos removal shall contain evidence of a current license issued under section six B ... In no event shall any public contract involving the removal, containment or encapsulation of asbestos or material containing asbestos be performed by anyone other than a general contractor or subcontractor licensed to perform such work. G.L.c. 149, §44D(10) (1998).
The purpose of Chapter 149 is to ensure that an awarding authority obtains the lowest price among responsible contractors and to establish an open and honest procedure for competition for public contracts. Modern Continental Construction Co. v. Lowell, 391 Mass. 829, 840 (1984); Interstate Engineering Corp. v. Fitchburg, 367 Mass. 751, 757-58 (1975); E. Amanti & Sons, Inc. v. Barnstable, 42 Mass.App.Ct. 773, 776-77 (1997). The ordinary meaning of the word “repair” is to restore to a sound or good state; to amend, set right or remedy. Webster’s New Universal Unabridged Dictionary (2d ed. 1979). Given that Contract #90-527 involves the removal of asbestos from the Fall River public schools, it is a contract for the repair of a building within the meaning of G.L.c. 149, §44A(2), and because it involves work in excess of $25,000, it was subject to competitive bidding requirements.
CFC argues, however, that Contract #90-527 was primarily a contract for job training such that the statutory bidding requirement for work on public buildings does not apply. The contract and its extensions, and the parties’ correspondence relating thereto, emphasize both the job training and asbestos removal aspects of the arrangement. Where a contract *39 involves services not subject to competitive bidding requirements that are intertwined with procurements subject to such requirements, bidding is required on the whole package. Datatrol, Inc. v. State Purchasing Agent, 379 Mass. 679, 696 & n. 14 (1980) (concluding that bidding was required on a contract for a lottery computer system which involved both the purchase of equipment, for which bidding was required under G.L.c. 7, §22, and the provision of computer support services). Similarly, where a contract consisted of a public works component, the construction of a sewer pipeline, and a public building component, the construction of two pumping stations, the entire contract was subject to the bidding requirements of G.L.c. 149, §§44A-44H, and the court would not inquire into whether the public building aspect was “significant” or only “incidental” to the project. Modern Continental Construction Co. v. Lowell, 391 Mass, at 839. In the present case, this Court concludes that Contract #90-527 and its extensions involve job training services which are so intertwined with work on a public building, the asbestos removal and encapsulation, that bidding under G.L.c. 149, §44A was required on the entire package.
It is well established that a contract created in violation of competitive bidding statutes is invalid and unenforceable. Majestic Radiator Enclosure Co., Inc. v. County Commissioners of Middlesex, 397 Mass. 1002, 1003 (1986); Phipps Products Corp. v. Massachusetts Bay Transportation Authority, 387 Mass. 687, 691-92 (1982). Our courts have required strict adherence to bidding requirements even where no harm to the public authority was shown, where the violation benefitted the public and where there was no showing of bad faith or corruption. Phipps Products Corp. v. Massachusetts Bay Transportation Authority, 387 Mass, at 692. The fact that CFC had an ongoing relationship with the City from 1989 to 1996, and that the City repeatedly purported to enter into contract extensions with CFC does not change the result. Although the parties may have been under a mutual mistake that competitive bidding was not required and CFC rendered the services at issue in good faith, the public interest in adherence to statutory bidding procedures nonetheless overrides any equitable considerations. Majestic Radiator Enclosure Co., Inc. v. County Commissioners of Middlesex, 397 Mass, at 1003; Phipps Products Corp. v. Massachusetts Bay Transportation Authority, 387 Mass, at 693. Thus, the 1997 extension of Contract #90-527 is void and unenforceable due to the failure to comply with the competitive bidding requirements of G.L.c. 149, §44A(2), and CFC may not recover the $55,668.12 sought.
Further, CFC’s attempt to recover under a theory of promissory estoppel for the training and asbestos removal work performed must fail. It is well established that where a contract is illegal by reason of failure to comply with statutory requirements, the court will not allow recovery based on the equitable doctrine of quantum meruit, because to do so would, in effect, nullify the statutory scheme with respect to contracts with municipalities. Lowell v. Massachusetts Bonding & Ins. Co., 313 Mass. 257, 272 (1943); Potter & McArthur, Inc. v. Boston, 15 Mass.App.Ct. 454, 459-60 (1983). In the present case, allowing CFC to recover for the work performed under the invalid contract on a theory of promissory estoppel would similarly undermine the competitive bidding laws. Moreover, the courts have been reluctant to apply . principles of estoppel to public entities where to do so would negate requirements of law intended to protect the public interest. Phipps Products Corp. v. Massachusetts Bay Transportation Authority, 387 Mass, at 690. Thus, reliance cannot be the basis to estop a municipality from asserting a statutory impediment to a contract claim. McAndrew v. School Committee of Cambridge, 20 Mass.App.Ct. 356, 361 & n. 11 (1985). Accordingly, the defendants are entitled to judgment as a matter of law on Count IV of the complaint.[3]
Nonetheless, CFC contends that it had a second, separate contract with the City in 1997 for the AHERA inspection, under which it is owed $24,000 for inspection services. While a contract to periodically inspect public school buildings to ensure compliance with asbestos regulations arguably constitutes “maintenance” within the meaning of G.L.c. 149, §44A(2), the statute would not apply because the amount in question is below the $25,000 threshold which triggers competitive bidding requirements. However, CFC has failed to produce a written reinspection contract in the summary judgment record and thus appears to be alleging an oral contract. Any such contract would be unenforceable pursuant to G.L.c. 43, §29 and Section 2-716 of the Fall River Revised Ordinances. Persons dealing with a municipality must take notice of limitations of this kind upon the contracting powers of the municipality, are bound by them, and cannot recover upon contracts attempted to be made in violation thereof. Malborough v. Cybulski, Ohnemus & Assoc., Inc., 370 Mass. at 160; Adalian Brothers, Inc. v. Boston, 323 Mass, at 631. Thus, CFC has no reasonable expectation of proving an enforceable reinspection contract at trial, and the City is entitled to judgment as a matter of law on Count I of the complaint.
The defendants next move for summary judgment on Count II of the complaint alleging malicious interference with contractual and advantageous business relations against Lambert.[4] To establish the tort of intentional interference, CFC must show the existence of a contract or business relationship which contemplated economic benefit, Lambert’s knowledge of the contract or business relationship, Lambert’s intentional interference with the contract or business relationship for an improper purpose or by improper means, and damages. Swanset Development Corp. v. Taunton, 423 Mass. 390, 397 (1996); United Truck *40 Leasing Corp. v. Geltman, 406 Mass. 811, 812, 815-17 (1990). Foremost, it is doubtful that CFC can maintain a claim of interference with contract based on a contract which is void in accordance with public policy for failure to comply with statutory bidding requirements. See American Private Line Services, Inc. v. Eastern Microwave, Inc., 980 F.2d 33, 35-36 (1st Cir. 1992) (concluding that there was no claim for contractual interference, as a matter of law, where there was no enforceable contract). Compare Chemawa Country Golf, Inc. v. Wunk, 9 Mass.App.Ct. 506, 509 (1980) (suggesting that a tortious interference claim must involve a lawful contract). Similarly, any claim of contractual interference based on the alleged reinspection contract, which would be unenforceable for failure to comply with the statutory and ordinance requirements of a writing signed by the mayor, must fail.
Further, with respect to the tort claims, it is essential that the defendant acted without justifiable cause. Chemawa Country Golf, Inc. v. Wunk, 9 Mass.App.Ct. at 510. In the present case, CFC alleges that Lambert’s non-payment of the training and asbestos removal bill at issue was prompted by his political and personal displeasure with CFC Executive Director Mark A. Sullivan, Jr. based on interactions between the two when Sullivan was Chairman of the Fall River Affordable Housing Corporation. However, the record establishes that Lambert acted at least in part based on the advice of the City’s Law Department that paying CFC’s invoice under the 1997 contract extension would be in violation of G.L.c. 149, §44A. Thus, CFC has no reasonable expectation of proving at trial that Lambert acted unjustifiably without a purpose related to a legitimate municipal interest. Compare Alba v. Simpson, 44 Mass.App.Ct. 311, 315, rev. den., 427 Mass. 1104 (1998).
Finally, Lambert, as a municipal official, would likely have immunity against CFC’s claims of tortious interference because his decision not to pay CFC under the 1997 contract extension was one made in the scope of his official duties. See Swanset Development Corp. v. Taunton, 423 Mass, at 398. An employee acts within the scope of his employment where although he acts in part from some personal motive, his act is in some way connected with the employer’s interest and is otherwise within the purview of his authority. Pinshaw v. Metropolitan District Commission, 402 Mass. 687, 694-95 (1988). As discussed above, Lambert’s refusal to allow payment of CFC’s invoice under the 1997 contract extension was based at least in part by a determination that to do so would violate the competitive bidding statutes. The conduct alleged to constitute tortious interference thus occurred within the scope of Lambert’s official duties as mayor and cannot form the basis of liability. Accordingly, Lambert is entitled to judgment as a matter of law on Count II of the complaint.
Finally, Lambert moves for summary judgment on Count III of the complaint alleging that he is personally liable for negligence and/or breach of contract for arranging for CFC to perform services in violation of the competitive bidding laws. In order to establish negligence, the plaintiff bears the burden of proving a duty owed by the defendant, a breach of that duty, actual and proximate causation, and damages. Bennett v. Eagle Brook Country Store, Inc., 408 Mass. 355, 358 (1990). Viewing the summary judgment record in the light most favorable to CFC, it has failed to articulate or demonstrate any duty owed by Lambert which was breached. Accordingly, it has no reasonable expectation of prevailing on its negligence claim at trial. Similarly, with respect to a claim for breach of contract, the plaintiff bears the burden of demonstrating the existence of a contract between the parties. Canney v. New England Telephone & Telegraph Co., 353 Mass. 158, 164 (1967). On the present summary judgment record, CFC has failed to articulate or demonstrate a contract between itself and Lambert arranging the training and asbestos removal work at issue. Thus, Lambert is entitled to judgment as a matter of law on Count III of the complaint.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendants’ motion for summary judgment be ALLOWED on Count I of the complaint. It is ORDERED that a declaration enter DECLARING and ADJUDGING that the 1997 extension of Contract #90-527 is void and unenforceable due to the failure to comply with the requirements of G.L.c. 43, §29 and Section 2-716 of the Fall River Revised Ordinances, and is further void and unenforceable due to the failure to comply with the competitive bidding requirements of G.L.c. 149, §44A(2); and that the alleged contract for AHERA reinspection services is void and unenforceable due to the failure to comply with G.L.c. 43, §29 and Section 2-716 of the Fall River Revised Ordinances.
It is further ORDERED that the defendants’ motion for summary judgment be ALLOWED on Counts II, III and IV of the complaint.

Although the City did not specifically cite this statute, the statute is substantially the same as the Fall River Ordinance relied on by the City.

Although CFC seeks to recover from Mayor Lambert personally under a theory of promissory estoppel, this claim must also fail insofar as there is no evidence in the summary judgment record of any representation by Lambert which induced CFC to perform the work at issue.

The defendants have moved to strike two affidavits of Mark Sullivan, the Executive Director of CFC, which detail certain political interactions between himself and Lambert. Such evidence is relevant to whether Lambert acted with an improper motive in denying CFC payment for its services. Accordingly, the motion to strike is denied.